SLIP OPINION

# SUPREME COURT OF ARKANSAS

No. CR-13-721

| | |
|---|---|
| RICHARD RALPH CONTE<br>APPELLANT | **Opinion Delivered** May 21, 2015 |
| V. | APPEAL FROM THE FAULKNER<br>COUNTY CIRCUIT COURT<br>[NO. CR-11-1028] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE CHARLES E.<br>CLAWSON, JR., JUDGE |
| | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On January 22, 2013, appellant, Richard Ralph Conte, was convicted by a Faulkner County Circuit Court jury of two counts of capital murder and two counts of firearm enhancements. The State waived the death penalty and the circuit court sentenced Conte to two terms of life imprisonment without the possibility of parole for the capital murders, and fifteen years each on the firearm enhancements. The sentences were to run consecutively.

On January 24, 2013, Conte timely filed his notice of appeal. On January 30, 2014, Conte subsequently filed his brief with this court, the State timely responded, and Conte timely replied. On September 18, 2014, we remanded this matter to settle the record and ordered rebriefing. *Conte v. State*, 2014 Ark. 381 (per curiam). On October 30, 2014, Conte filed his substituted brief, and this matter is now properly before the court.

Conte now appeals from his 2013 convictions and sentences and raises five points on appeal: (1) the circuit court erred in denying Conte's motion to dismiss when it found that

SLIP OPINION

the State had a satisfactory reason for the nine-year delay in bringing charges; (2) the circuit court erred in not granting Conte's motion for directed verdict; (3) the circuit court erred in granting the State's motion in limine as this violated Conte's right to a "complete defense" under both federal and state constitutional guarantees of due process, confrontation, and compulsory process; (4) the circuit court erred by allowing inadmissible 404(b) evidence regarding Conte kidnapping Lark Swartz; (5) the circuit court erred when it overruled numerous relevancy objections

*Facts*

In the early morning hours of May 19, 2002, Carter Elliott and Timothy Robertson were found dead in Elliott's home in Faulkner County, Arkansas. The victims were each killed with one gunshot to the back of the head. Although Conte was developed as a suspect early in the investigation, he was not charged with the murders until 2011. The State's theory of the case was that Conte was obsessed with, and sought control over, his estranged wife, Lark Swartz. Swartz had previously been married to Elliott. Prior to Elliott's murder, Swartz told Conte that she planned to end their short marriage and was leaving Conte. According to the State's theory of the case, Conte killed Elliott and Robertson in an effort to eliminate competition for Conte and convince Swartz not to continue pursuing a divorce. Approximately one month after the murders, in Nevada, after Swartz had continued with plans to divorce Conte, Conte kidnapped Swartz and was planning to kill Swartz and himself but ultimately surrendered to authorities.

At trial, Swartz testified that she was married to Carter Elliott from 1974 to 1992 and

resided in Conway. The couple had two children together, Trey Elliott and Ashley Waldron. After their divorce, Swartz testified that she moved to Katy, Texas, and ultimately to Salt Lake City, Utah, where her sister, Gay Clark, and her brother-in-law, Kevin Clark, resided. While living in Salt Lake City, Swartz met Conte, an emergency-room physician. She further testified that Conte and her brother-in-law, Dr. Clark, went to medical school together and had known each other for at least ten years. Conte resided in Carson City, Nevada. Swartz testified that she began dating Conte seriously in January 2001. Swartz testified that the two became engaged in April or May 2001, married on October 19, 2001, in a civil ceremony in St. George's, Granada, and then married in a church ceremony on December 1, 2001 in Bequia, in the Grenadines Islands. After the two were married, the couple continued to maintain their long-distance relationship, now marriage, in their respective cities. Swartz kept her condominium in Salt Lake City because her daughter, Ashley, resided there at times and was engaged to be married soon.

Swartz testified that during her relationship with Conte she had conversations with Conte about their pasts, including her relationship with Elliott, and her relationship with her daughter, Ashley, and Ashley's upcoming wedding. Over Conte's objection, Swartz testified that Conte told her he was recruited out of high school to work as a hired killer, or mercenary, for the Vinnell Corporation, an undercover-operations group for the United States Military. She further testified that he had a logo on his business card that stated "Have gun, will travel." Over Conte's objection, she testified regarding a letter he had written to her in which he claimed he was in Cambodia on a special-operations mission. She further

testified that Conte brought dog tags to her that he received for passing his training for parachuting. Swartz testified that while they were dating she went with Conte to his cabin in Duck Creek, Utah. She testified that Conte explained to her that his Duck Creek residence was a military safe house for his friends in special operations; there were many firearms, surveillance cameras, tape-recorders and phone-tapping devices. However, Conte resided and worked in Carson City. Swartz indicated that Conte used the alias "Paladine,"[1] and called his home in Carson City "Paladine Arms." Swartz testified that she had not been to Conte's home in Carson City until after the two were married. She testified that his home in Carson City was just like the Duck Creek cabin. She testified that there were all kinds of knives and guns, mercenary magazines all over the floor; war movies; guns over the door post and in every jacket and every pocket of every jacket. Swartz also testified that in the Carson City home "the - - it looked like a meat hook hanging in the - - bedroom and then the - - [there were] these large silver rings that were embedded into his Paul Bunyan style-bedpost." She testified that both homes were filthy and messy and covered with guns and military paraphernalia. Swartz testified that after seeing these things, their "relationship began to deteriorate."

Swartz testified that around Valentine's Day, 2002, Swartz told Conte that she "was very unhappy and [she] was going to get a divorce." She testified that when she told Conte she wanted a divorce, Conte was crying, begged her not to leave him, and said that he would

---

[1]We note that Conte's dog tags in the record, Exhibit No. 30, spell "Paladine," "Paladin."

be humiliated and he was very upset. Swartz further testified that she and Conte continued to communicate after their separation and Conte had access to her combination lock on the door of her condominium in Salt Lake City. She testified that while they were separated, Conte sent flowers, gifts, jewelry, and cards to her home and work place. She testified that she found notes from him in books she was reading, on her refrigerator, in her lingerie drawer, totaling over one hundred items. Swartz also testified that during this time, there was an engagement party for Ashley on April 13, 2002, in Conway. Swartz testified that Elliott attended the party and that Conte was aware of this. Swartz testified that on April 17, 2002, Conte called her, and she could hear gunfire and machine guns in the background. She testified that Conte told her that he was in Afghanistan, pinned under an ATV or SUV, was going to be killed at any moment, and wanted to tell Swartz he loved her and that – "this might be the last time we ever talk to each other." Swartz testified that on or around May 2, 2002, Conte came to Salt Lake City to show Swartz where he had been shot while in Afghanistan.

On May 8, 2002, Swartz filed for divorce. Swartz testified that during their separation and after she had filed for divorce, she and Conte had knowledge of each other's schedules. She testified that Conte was not supposed to be working the weekend of May 17–19, 2002. Swartz testified that on or about May 19, 2002, she learned of Elliott's and Robertson's deaths and traveled to Conway. During this time, she had communications with Conte and he was aware of the murders. Swartz testified that once she returned to Salt Lake City, "[Conte] told me that a bullet that is left next to the victim's head was the signature of the killer and for

[me] to be quiet about it."

Next, over Conte's objection, Swartz testified that when she arrived home from work on June 20, 2002, Conte was at her home, armed with a gun, with a scope and silencer on it, and a stun gun. She testified that Conte tied her down, threatened to kill her and himself, and forced her to drink something. Swartz testified that when she woke up she was handcuffed in the back of Conte's truck. She further testified that while she was in and out of consciousness, Conte was very distraught about their break-up and was threatening to kill her and himself. Swartz testified that she eventually did wake up and was handcuffed to the rings on his "Paul Bunyan" bed in Carson City. Swartz testified that she did not send her family emails but that Conte wrote messages to her family and friends from her email address indicating that she had met a man over the Internet, had sex with him, killed him, and that she was now in hiding. Swartz further testified that Conte had pictures of her with Elliott and her family, along with pictures of another ex-boyfriend, even though she had never brought those pictures to Conte's home. Swartz was eventually released after her family discovered that Conte had kidnapped her and called the police.

Kevin Clark, Swartz's brother-in-law, testified that he and Conte met in medical school and that he had known Conte for over twenty years. According to Clark, Conte said he was a contract killer for the Vinnell Corporation for the United States government and had told Clark many stories of his operations and had shown him medals and awards he had earned. Clark testified that on April 17, 2002, while Conte and Swartz were separated, Conte called Clark and relayed that he had been in Afghanistan, trapped under an SUV that he had

and been hit by several bullets. Conte also told Clark that he was flying back to Utah and would meet Clark at his office in a few hours to have the bullets removed. Clark met Conte, took him to the hospital for x-rays, then returned to his office and removed eight or nine bullets. Clark testified that the bullet wounds were not consistent with gunshot wounds but "looked like they had been inserted with small incisions."

With regard to Swartz's kidnapping, Clark testified that he received a call from Ashley, on or around June 21, 2002, reporting that Conte had her mother, and asking Clark to call Conte. Clark testified that he called Conte and Conte reported that "he had Lark, she was ok, tied to a chair." Clark testified that he told Conte that the police were coming, not to fight them, to untie Swartz and go sit on his porch in his underwear. Clark testified that was the last time he talked to Conte. Clark also testified that he received a call from Conte on the Sunday after the murders from Conte's land-line phone at his Duck Creek residence, and Conte had told him he had car trouble.

Ashley testified that on June 21, 2002, she could not reach her mother, Swartz, and contacted Conte looking for her mother. Ashley testified that when she contacted Conte, he informed her that "your mom picked up a man in Park City and she slept with him and she killed him and I've given her money and I've taken her down to the border in Mexico and you're never going to see her again." Ashley testified that she spoke on the phone with her mother who was "out of it." Ashley also testified that she received emails from Swartz during the time of the kidnapping that she turned over to authorities.

Trey Elliott also testified concerning Swartz's kidnapping. Trey testified that after his

father's murder on June 21, 2002, Conte kidnapped his mom. Trey testified that he received a call from his mother, she sounded drugged, and she said, "Conte's got me." Trey testified that he then spoke with Conte on the phone, Conte was very upset and said he had made a huge mistake and was going to kill himself. Trey testified that he tried to get Conte to calm down and begged Conte not to kill his mother.

Richard Gathright testified that he is Swartz's brother and was aware that in the spring of 2002 Swartz and Conte had separated and that Swartz was in the process of divorcing Conte. Gathright testified that his sister, Gay Clark, and his brother-in-law, Dr. Kevin Clark, were at his home in Pompano Beach, Florida, when he learned of the murders of Elliott and Robertson; Clark then called Conte three or four times, but could not reach him. Gathright further testified that Conte returned Clark's call approximately forty-five minutes later from Conte's Duck Creek, Utah, land-line phone. Gathright also testified about the kidnapping. Gathright testified that he flew to Utah, and upon Swartz's release went with Swartz to the Utah Sheriff's Department to collect some of her personal belongings. Gathright further testified that he received emails from Swartz during the time she was kidnapped that did not appear to be from Swartz.

Sergeant Rick Brown, with the Nevada Department of Public Safety, was an investigator with the Douglas County Sheriff's Office in Douglas County, Nevada. Brown testified that he responded to Ashley's and Trey's calls regarding Swartz's 2002 kidnapping. After Conte was in custody, Brown, along with Arkansas law enforcement, searched Conte's residence. Brown testified that the officers searched Conte's Carson City home and his silver

Dodge pickup truck. Brown testified to seizing a large stockpile of weapons, and a book titled, "Quiet Killers, Silenced Weapons in War and Espionage" about how to execute people quietly. Brown testified that officers located a brown piece of cardboard that stated "Edmond Carter Elliott, Conway, Arkansas" with Elliott's phone number and address written on it. Brown further testified that officers located a manilla colored piece of paper with "Detco," which was Elliott's business' name, written on it and a telephone number written beneath it. Brown further testified that officers located documents dated May 11, 2002, with general background information on Conway and Faulkner County, which included: documents with online search results for police frequencies, radio frequencies, and fire frequencies; documents with results from the Federal Communications Commission that were downloaded showing the call signs and radio frequencies and the issue and expiration dates for the Conway Emergency Services; county law enforcement and fire frequencies; and Mapquest results for maps of Conway and Faulkner County, Arkansas. Brown also testified that officers located a printed Internet article dated May 27, 2002 on the double murder of Elliott and Robertson.

Brown testified that officers also searched Conte's truck and located a piece of paper with "Conway's Hojo Inn, Room 204," "Channel 4, Channel 7 of Little Rock," and "Log Cabin Paper" written on it. Brown also testified that officers found printouts of several emails wherein Conte explains to Swartz that he will do anything to keep them together and she is the center of his life. Brown testified that officers also located Glaser Blue Tip Safety Slugs and white towels.

Charles McLemore, a retired officer with the Arkansas State Police, testified that in

2002 he was a criminal investigator for the State Police. He further testified that he traveled to Douglas County, Nevada, and participated in the search of Conte's residence in Carson City in June 2002. McLemore testified that, during the search, officers seized a large number of firearms, including a 9mm firearm, 9mm Glaser Blue Tip Safety Slugs, and a clip of ammunition that held 15 bullets. The clip contained 14 bullets. McLemore further testified that with 15 bullets in a clip, one bullet could be held in the chamber, for a total of 16 bullets. McLemore testified that officers located a .45mm firearm and .45mm Blue Tip Glaser Safety Slugs. McLemore testified that officers also located a sound suppressor for firearms and a book titled "The History of Torture and Executions."

Jim Barrett, a lieutenant with the Conway Police Department, testified that on May 19, 2002, he was a Sergeant in the Detective Division at the Conway Police Department and responded to the death investigation at the Elliott home. Barrett testified that officers located an unfired .45 mm Glaser Blue Tip Safety Slug in a baseball cap at the scene. Barrett testified that in his twenty-three years in law enforcement he had never seen this type of ammunition used in the commission of a crime. He also testified that the Glaser Blue Tip Safety Slugs were expensive and sold in gun shops, not retail and hunting stores. Barrett further testified that he was also involved with the search of Conte's home in Carson City in June 2002. Barrett testified that he took a sample of bugs and soil from Conte's Dodge Silver truck to send to a geologist and an epidemiologist to determine if the sample had come from a specific region of the country. No results were obtained that were helpful to the investigation.

Steve Hargis, a firearms and tool examiner at the Arkansas State Crime Laboratory, also

testified. Hargis testified that, of the barrels and firearms tested, none demonstrated that they had been used to fire the shots that killed Elliott and Robertson. Hargis further testified that Blue Tip Glaser Safety Slugs are rare and expensive.

Dr. Stephen A. Erickson, Deputy Chief Medical Examiner at the Arkansas State Crime Laboratory, testified that he performed the autopsies on Elliott and Robertson. Erickson testified that both men died from gunshot wounds to the back of each of their heads. Erickson testified that the bullets used were very powerful and "created a tremendous amount of damage." Erickson further testified that, upon reviewing the x-rays, he suspected he was going to find Glaser Blue Tip bullet, and he did. He further testified that in his 19 years of practice, he has seen thousands of gunshot wounds but had only seen this type of bullet one time, during his fellowship, and the damage done was "forever impressed" on his mind. Erickson also testified that the wounds in this case were atypical because there was no evidence of powder or smoke from the gun. He accounted for this atypical finding by the towels found at the scene that were used to filter the gas and smoke. Erickson testified that the bodies did not have defensive wounds or injuries suggesting a struggle.

Finally, the State presented testimony from two inmates. Rusty Glover testified that at the time of trial, he was in the Faulkner County jail pending felony domestic-battery charges and revocation of a suspended sentence. Other than the pending charges, Glover testified that he had eleven prior felony convictions. Glover further testified that he went to high school with Elliott's children but had not seen them since high school. Glover testified that he met Conte in the medical pod in 2012 and played cards and visited with

Conte frequently. The two were housed together in the medical unit for a month and a half. Glover testified that when he realized who Conte was and what he had been charged with, he asked Conte, "Did you do it? And [Conte] said 'Hell, yeah, but they have no evidence.'" Glover testified that Conte also stated that the authorities had no weapon and "they're about to run out of time. They're going to have to let me go." Glover further testified that Conte explained that authorities "had questioned him about a vehicle, about an anthropologist checking his vehicle for Arkansas bugs to see if they could put the vehicle [in Arkansas], and he said they checked the wrong vehicle. . . . [Conte] said they had the truck, the grill for . . . you know a specialist." Glover testified that he was not familiar with the word "anthropologist" before Conte told him about the anthropologist checking his truck for bugs. Glover further testified that Conte told him there were two victims, Elliott and Elliott's bodyguard. Glover testified that he was not aware of Robertson's death until Conte told him there were two victims. Glover also testified that Charles Reeves, another prisoner, also heard Conte's confession.

Next, Charles Reeves testified that he had two prior felony convictions and at the time of trial had additional charges pending against him. Reeves testified that he was in the medical pod of the Faulkner County jail with Conte and Glover. Reeves testified that he had little interaction with Conte but did overhear Conte and Glover discussing Conte's case. Reeves testified that he heard Conte state that "they didn't have anything on him" and there was a discussion about a vehicle that was searched being the wrong vehicle. Reeves further testified that he heard Glover ask, "Well, did you do it?" and Conte responded, "Yeah, I did

12

it, but they ain't got no proof."  After this conversation, Reeves testified that Glover asked

Reeves if he had overheard the conversation, and Reeves confirmed that he had. Reeves

further testified he did not know any of the people involved in Conte's case.  Reeves further

testified that he did not contact the authorities, but the prosecutor's office contacted him.

Reeves also testified that he was not offered any leniency or a deal for his testimony.

On August 26, 2011, Conte was charged with and convicted of the murders of Elliott

and Robertson.

*Points on Appeal*

I. *Sufficiency of the Evidence*

Although Conte's sufficiency argument is his second argument on appeal, we address

it first due to double-jeopardy concerns. *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815

(2004).  We treat a motion for a directed verdict as a challenge to the sufficiency of the

evidence.  *Whitt v. State*, 365 Ark. 580, 232 S.W.3d 459 (2006).  In reviewing a challenge

to the sufficiency of the evidence, this court assesses the evidence in the light most favorable

to the State and considers only the evidence that supports the verdict. *Tillman v. State*, 364

Ark. 143, 217 S.W.3d 773 (2005).  This court will affirm a judgment of conviction if

substantial evidence exists to support it. *Id*.  Substantial evidence is evidence which is of

sufficient force and character that it will, with reasonable certainty, compel a conclusion one

way or the other, without resorting to speculation or conjecture.  *Id*.  Evidence is substantial

when it is forceful enough to compel a conclusion one way or the other, beyond suspicion

and conjecture.  *Id*.  We need consider only that testimony which supports the verdict of

guilty. *Id*. Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id*. Whether the evidence excludes every other reasonable hypothesis is left to the jury to decide. *Id*. Finally, the credibility of witnesses is an issue for the jury and not the court. *Id*. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id*.

With these standards in mind, we turn to Conte's first point on appeal. Conte's primary challenge to the sufficiency of the evidence supporting his capital–murder convictions focuses on the two inmates, Glover and Reeves, who each testified that Conte confessed to the crimes. At trial, Conte made the following motion for directed verdict:

DEFENSE COUNSEL: The motion for directed verdict is made as to both counts of capital murder pursuant to Rule 33.1 of the Arkansas Rules of Criminal Procedure, along with the Due Process Clause of United States Constitution through Amendment 14 and the Due Process Clause of the Arkansas Constitution.

The motion for directed verdict is based upon the State's insufficient proof that Dr. Conte caused the death of another person as to the capital murder charges in the count involving Mr. Elliott and the count involving Mr. Robertson and, also, as to the lesser included offense of first degree murder or any other lesser offense involving the issue of causation. I think the Arkansas cases indicate that we have to talk about what element is lacking and that's – what this motion addresses.

If we put the testimony of Mr. Glover and Mr. Reeves aside – and I urge the Court to do so because they are two very credibility-impaired individuals given their

14

lengthy criminal history and their incentive to fabricate to try to better their position with the prosecutor's office. I don't contest their testimony that they haven't been offered anything by the prosecutor, but nevertheless, those gentlemen know how to try to manipulate the system. So I ask the court to just disregard their testimony for the purposes of the motion. Past that, there is no evidence that connects Dr. Conte to these two homicides.

As I said in opening, there's not any eye witness, not any forensics, not any ballistics that connect him to the homicide. Nobody puts him in Arkansas at the time. All the state's case occurs in Utah and all the state's evidence, aside from the crime scene and the crime lab dealing with Dr. Conte, occurs in Utah and in Nevada, most of which deals with the homicide.

I know they will make the circumstantial case argument based on Dr. Conte's conduct subsequent to the homicides, but for our record I move for a directed verdict on the element of causation on both counts of capital murder and both lesser included counts of murder one and any other included count.[2]

The State argues that Conte moved for a directed verdict on the issue of the credibility of Glover and Reeves and is now bound on appeal to the scope and nature of his directed-verdict motion. The State further argues that the issue of credibility of witnesses is an issue for the jury, not this court. Finally, the State argues that Conte's convictions are supported by substantial evidence.

Here, Conte's challenge to the sufficiency of the evidence supporting his convictions focuses on the credibility of Glover and Reeves. As Conte acknowledges, the credibility of

---

[2]Conte also renewed his motion for directed verdict at the close of the evidence.

witnesses is an issue for the jury, and this court will not second-guess the credibility determinations made by the fact-finder. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). The jury is free to believe all or part of any witness's testimony, to resolve questions of conflicting testimony and inconsistent evidence, and to believe the State's version of the facts rather than the defendant's. *Id.* Conte contends, however, that this court should nonetheless disregard the testimony of both Glover and Reeves in determining whether substantial evidence supports his convictions because they were "clearly unbelievable." He argues that they were jailhouse "snitches" with extensive criminal histories and that they testified against Conte in hope of receiving a reduction in their sentences.

On appeal, we will disregard testimony that the jury has found to be credible only if it is so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it. *Williams v. State*, 351 Ark. 215, 91 S.W.3d 54 (2002). The weighing of evidence lies within the province of the jury, and this court is bound by its determination regarding the credibility of witnesses. *Id.* The jury is free to believe all or part of a witness's testimony, and inconsistent testimony does not render proof insufficient as a matter of law. *Id.*

Here, Conte urges this court to disregard Glover's and Reeves's testimony as "inherently unreliable." However, both Glover and Reeves testified that they had not been promised anything in return for their testimony. In addition, Glover provided details about the crimes that were not widely known and that were consistent with other evidence presented at trial, such as the testing of the soil and insects from Conte's truck, and that Conte

had stated the authorities had tested the wrong truck. Reeves also corroborated Glover's testimony. Thus, their testimony was not clearly unbelievable, and it was for the jury to determine their credibility.

When viewed in the light most favorable to the State, the evidence established the crimes and Conte's connection to them and is sufficient evidence for the jury to convict Conte. Thus, we hold that substantial evidence supports Conte's convictions and sentences, and the circuit court did not err in denying Conte's motion for directed verdict.

II. *Motion to Dismiss: Nine-Year Delay*

For his next point on appeal, Conte asserts that the circuit court erred when it denied his motion to dismiss based on prosecutorial delay. Because charges were not filed against Conte for the 2002 murders until August 26, 2011, Conte moved to dismiss the charges prior to trial. In his motion, Conte argued that a key alibi witness, William Pringle, had died in 2008 and that the prosecutorial delay in filing charges gave the State a "distinct advantage" in this case in violation of the Due Process Clauses of the Arkansas and United States Constitutions. Conte asserted that Pringle, a neighbor at his Duck Creek residence, was interviewed in July 2002 and that Pringle told Investigator Brown that Conte could not have been involved in the murders because he had seen Conte driving his truck three or four times on May 19, 2001, the day before the murders. Conte asserted that because he was prejudiced by the nine-year delay in filing charges, the State had the burden to show a satisfactory reason for the delay. Conte noted that two prior prosecutors had declined to file charges against him and asserted that no new evidence was discovered after the case had been reviewed by these

SLIP OPINION

prior prosecutors.

The State responded that the case had been under investigation since 2002 and that, the Conway Police Department had presented the case file to the prosecuting attorney's office on several occasions and, while the prior prosecutors had refused to file charges, the current prosecutor filed the charges after reviewing the case file. At the hearing on Conte's motion to dismiss, Barrett testified that he was the primary investigator on the case and that it had remained an active and open investigation since the day of the murders. Barrett testified that there had been continuous strategy meetings to determine whether different angles or leads needed to be pursued. Barrett denied that he had intentionally caused a delay to procure the unavailable witness and claimed that he had not learned of Pringle's death until he was flying back to Arkansas with Conte following Conte's arrest on the murder charges.

After the hearing on the motion to dismiss, the circuit court took the matter under advisement and then entered a letter order on April 27, 2012, denying the motion. The order provides:

> The circuit court's April 27, 2012 order denying Conte's motion to dismiss. Following the hearing on [Conte's] . . . motion to dismiss which was held this past Tuesday I have had the opportunity to review the exhibits which were introduced and the motions and briefs which were provided by the parties. Based upon this review you may accept this letter as the Court's ruling with regard to the defendant's motion to dismiss on the charges currently pending.
>
> Mr. Lassiter contends that the delay in filing charges against the defendant has resulted in a prejudice to his ability to defend himself. Specifically that a potential alibi witness, one Mr. Pringle, passed away in 2008. The State on the other hand contends that the delay was not the result of any effort by the state to obtain an advantage but simply caused by circumstances which they could not control. Specifically, Detective Barrett testified that this matter has been an ongoing investigation since the events occurred in May, 2002 and that from time to time he would obtain additional information and

18

approach the Office of the Prosecuting Attorney without charges being filed. Eventually this matter was presented to this prosecutor's office in August, 2011 and the charges were filed. The testimony clearly indicates that Detective Barrett was unaware that Mr. Pringle had passed away.

Therefore, under the language of *Scott v. State*, 263 Ark. 669 (1978) at page 674,

> "Since Scott was able to show prejudice to his defense unless the state can come forward with a satisfactory reason for the delay the charges should be dismissed."

It is the Court's conclusion that the state has presented a satisfactory reason for the delay.

Conte asserts that he was prejudiced by Pringle's intervening death and the State's failure to show a satisfactory reason for the delay. Conte contends that law enforcement "shopped" the case to three different elected prosecutors, and the circuit court condoned this "shopping" as a "satisfactory reason for the delay." Conte also contends that the State conceded in its pleadings to the circuit court that "no new credible evidence" was ever developed and the State had the same case the day the felony information was filed, August 26, 2011, as it did on June 26, 2002, the day law enforcement interviewed Conte at the Douglas County, Nevada Sheriff's Office regarding the homicides. Further, Conte asserts that Elliott's daughter, Ashley, actively campaigned for the current prosecutor so that charges would be brought against Conte. Finally, Conte contends that the circumstances surrounding the charges being filed against him were fundamentally unfair under our constitution and his motion to dismiss should have been granted.

The State responds that Conte has changed his argument on appeal. The State contends that, on appeal, Conte does not even mention the death of his alibi witness,

Pringle, but instead now argues that he was prejudiced by the delay because two prior prosecutors felt there needed to be more evidence, law enforcement shopped the case, and Ashley appeared in campaign ads for the current prosecutor. Thus, the State asserts that the issue is not preserved for review. We agree that Conte may not change his argument on appeal and is bound by the arguments made below. Therefore, we will not address allegations concerning Ashley's campaign ads for the current prosecutor because that argument was not made to the circuit court. *See Buford v. State*, 368 Ark. 87, 243 S.W.3d 300 (2006).

Conte argues on appeal that the circuit court erred in denying his motion to dismiss based on the delay. Conte argues that he suffered severe prejudice and that the State did not present a satisfactory reason for the delay in filing charges. Conte relies on the State's admission that "no new credible evidence" had been discovered during the nine-year delay and asserts that the court "essentially signed off on Barrett shopping the same case to three different elected prosecutors."

Turning to the merits of Conte's remaining argument, in *United States v. Lovasco*, 431 U.S. 783 (1977), the Supreme Court held that a delay due to an ongoing investigation of the case does not deprive the defendant of due process, even if the defense was prejudiced by the lapse of time. *Id.* at 795-96. As the Court noted, "[t]he determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear cut, and reasonable persons often will reach conflicting conclusions." *Id.* at 793. The Court held:

> Proof of prejudice is generally a necessary but not sufficient element of the due process claim, and that the due process inquiry must consider the reasons for the delay

as well as the prejudice to the accused. . . . It requires no extended argument to establish that prosecutors do not deviate from fundamental conceptions of justice when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.

With regard to investigative delay, the Court held:

In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S. at 324, . . . precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," *Smith v. United States*, 360 U.S. 1, 10 . . . (1959). This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

Here, Conte asserts that he suffered severe prejudice and that the prosecution used the delay to gain a tactical advantage. The record demonstrates that Lieutenant Barrett testified that he approached two different prosecutors with the evidence against Conte in an attempt to bring charges against him, and he stated that the case was under continual investigation until the current prosecutor chose to file charges. Barrett stated that they continuously held strategy meetings to come up with different investigative angles. He also testified that he did not intentionally delay the case to procure the unavailability of a witness. Barrett stated that he first learned that Pringle had died when he was transporting Conte back to Arkansas following Conte's arrest. In addition to the testimony, the circuit court reviewed Conte's

statement, as well as a summary of Sergeant Brown's summary of his July 2002 interview with Pringle, which stated:

> On 7-02-02 at 2115 hrs., while Inv. Coverley completed an inventory of seized items, I conducted a brief interview with Mr. Pringle. Mr. Pringle informed me that he had been a friend with Dr. Conte for several years and he has sold him six pieces of property, to include the parcel where his cabin is. Mr. Pringle had heard that Dr. Conte was a possible suspect in homicides in Arkansas, through the local media. He informed me that he knew that Dr. Conte could not have been involved because he had seen him that weekend in May. Mr. Pringle explained that Dr. Conte had his truck towed from the cabin on or about May 20th of this year. He said that he had seen Dr. Conte driving his truck three or four times the day before the truck was towed. Mr. Pringle said that he did not talk with Dr. Conte that weekend, but talked to him, about that weekend, on June 19th, 2002. Mr. Pringle stated that Dr. Conte came back up to the cabin during the week of the 19th and stopped by the house.
>
> He said that Dr. Conte told him that he had not stopped by to talk in May, because he did not have his monthly mortgage payment and he was embarrassed. Mr. Pringle asked him about his truck and Dr. Conte told him that he thought that local kids had done something to his clutch while attempting to steal it. He told Mr. Pringle that on 06-19-02 Dr. Conte brought him two newspapers and seemed to be acting a bit strange. He said that he would not look him in the eye. Dr. Conte told him that he was leaving the area the next day, but he said he was in a hurry to get up to the cabin to talk with Lark on the Internet. Mr. Pringle said that on 06-20-02, at approximately 1030 hours, he saw Dr. Conte at the neighborhood garage dumpsters, but Dr. Conte would not look at him. I asked Mr. Pringle if Dr. Conte had ever talked to him about the military or doing work for the government and he said that he had not.

Also, we note that during his testimony at trial, Sergeant Brown testified that Pringle said that Conte could not have been in Conway the weekend of the crimes because Pringle had seen him in Duck Creek. Specifically, Brown testified that Pringle told him that he saw Conte driving his truck three or four times that weekend.

In *Scott*, *supra*, there was a three-year delay between the crime and the date on which charges were filed. The State did not respond to Scott's motion to dismiss, and no reason was provided for the delay or whether the State had good cause for the delay. We held that,

where the accused was prevented from using two alibi witnesses, one whose whereabouts were not known and the other who had died a year and a half after the crime, the State should have been required to provide a satisfactory reason for the delay. The case was remanded with directions that, unless the State demonstrated that the reason for the delay was other than to gain a tactical advantage against the accused, the charges should be dismissed.

In *Bliss v. State*, 282 Ark. 315, 668 S.W.2d 936 (1984), we addressed a five-year delay. In that case, minor children were removed from the parents' custody in 1978 based on allegations of sexual abuse. However, the mother and stepfather were not charged with rape of the children until 1983. We held that, although the delay was unusually long, it could not be said that the prosecution was intentionally delayed in order to gain a tactical advantage over the parents, and we found no prejudicial error.

Additionally, other jurisdictions have recognized that mere speculation about the loss of favorable evidence is insufficient to support a claim of prejudice. *State v. Hales*, 152 P.3d 321, 334 (Utah 2007). If a defendant claims prejudice because a previously available witness is now missing or unavailable, the defendant must provide the expected content of the witness's testimony and indicate how that document or witness would have aided the defense. *Id*. The defendant must also show causation by establishing that he could not have obtained the crucial evidence from another source and that the evidence would have been available if it were not for the government's delay in filing the charges. *Id*. Courts are uniformly in agreement that actual prejudice must be proven to advance a due-process claim

23

for pre-indictment delay. *State ex rel. Knotts v. Facemire*, 678 S.E.2d 847, 854 (W. Va. 2009).

Applying our law to the present case, based on the record before us, Conte has failed to demonstrate that he suffered substantial and actual prejudice resulting from the delay. The alleged prejudice, the loss of Pringle's testimony, was before the jury. In opening statement and closing argument, Conte's counsel, brought out the fact that Pringle placed Conte in Duck Creek during the weekend in question. Additionally, the expected content of Pringle's statement and that the statement would have aided Conte's defense by providing Conte with an alibi were before the jury. Further, Conte has not shown that the evidence could not be obtained from another source as Dr. Clark testified that Conte called him from Duck Creek the day after the murders, and Barrett testified that Pringle had told him Conte could not have committed the murders because he was in Duck Creek that weekend and that Pringle had seen Conte driving his truck "a couple of times" that weekend.

Moreover, the record demonstrates that there was no evidence that the State intentionally delayed bringing charges to obtain a tactical advantage over Conte. The record demonstrates that the investigation remained ongoing throughout the years, law enforcement was unaware of Pringle's death until Conte's arrest, that law enforcement made contact with previous prosecutors, and that a decision was made to resubmit the case to the new prosecutor, which resulted in the charges being filed. There is no evidence of delay to gain a tactical advantage. As the court in *Lovasco* explained, "[T]he decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine

whether prosecution would be in the public interest. Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment." Here, based on the record before us, the delay in filing charges while continuing to investigate the crimes, did not create the improper tactical advantage that violates due process.

In sum, the circuit court did not abuse its discretion on this point, and we affirm the circuit court.

### III. *The State's Motion in Limine*

For his third point on appeal, Conte contends that the circuit court erred in granting the State's motion in limine to prevent Conte from introducing evidence that third persons may have committed the murders. At the pretrial hearing on January 15, 2013, the State asserted that the defense would likely try to show that the murders had been committed by the husband of a woman with whom Elliott had been allegedly having an affair, someone that Elliott had done business with, or someone that he had gambled with and been assaulted by. The State asserted that these matters had been investigated by police and that there was no evidence to support third-party liability in this case. Thus, the State contended that it was irrelevant evidence and should be excluded.

Conte responded that he should be able to introduce evidence showing that there was a lack of investigation into other potential suspects once Conte kidnapped Swartz. Conte argued that the investigation was incomplete and that Elliott's business dealings and the alleged affair should have been investigated further. Conte argued that the State's case against him

was circumstantial and that to deprive him of the opportunity to present this type of evidence violated his right to present a complete defense and his constitutional rights of confrontation, due process, and compulsory process. Conte relied on the court of appeals' decision in *Smith v. State*, 33 Ark. App. 37, 801 S.W.2d 655 (1990), and asserted that he should be able to present the evidence. The circuit court granted the motion in limine and ruled, "If it's your contention that the investigation lacked completeness, I think you can argue that without getting in gambling and affairs and business deals. I think that's clear." In granting the motion, the circuit court held that *Smith* was not applicable.[3]

At the conclusion of trial, Conte made the following proffer: that a man named Raymond Merrill broke Elliott's jaw over a gambling debt; prior to Elliott's death a man demanded $50,000 from him for payment of a gambling debt; Elliott was having an affair with Danny Cook's wife at the time of the crimes, Cook confronted Elliott over the relationship with Cook's wife and Cook acted strange after the crimes; Dean West was an employee that Elliott terminated the week before the murders and West threatened to kill Elliott; and Elliott and Keller Johnson had a disagreement over some property litigation involving Johnson's father's estate.

Circuit courts have broad discretion in deciding evidentiary issues, and their rulings on the admissibility of evidence are not reversed on appeal absent an abuse of discretion. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818. In *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320,

---

[3]We note that *Smith* predates our decision in *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320.

we discussed the standard for admissibility of evidence incriminating third persons and held

that

> [a] defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.
>
> . . . .
>
> [The rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

*Zinger*, 313 Ark. at 75, 852 S.W.2d at 323 (quoting *State v. Wilson*, 367 S.E.2d 589 (N.C.

1988)).

In *Walker v. State*, 353 Ark. 12, 17, 110 S.W.3d 752, 755 (2003) we explained our

holding in *Zinger*:

> We have held that a defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible. [*Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000)]; *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993)(*citing State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988)). This rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability; evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt. There must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

In *Armstrong v. State*, 373 Ark. 347, 284 S.W.3d (2008) (*Armstrong II*), we reaffirmed

our holding in *Zinger* and held that our holding was consistent with the United States

SLIP OPINION

Supreme Court's holding in *Holmes v. South Carolina*, 547 U.S. 319 (2006).

*Zinger* held that the evidence a defendant wishes to admit to prove third–party guilt must sufficiently connect the other person to the crime. *Armstrong II*, 373 Ark. at 353, 284 S.W.3d at 5 (2008); *see also Armstrong v. State* (*Armstrong I*) 366 Ark. 105, 233 S.W.3d 627 (2006), on direct appeal, we considered third–party death threats that Armstrong alleged should have been admitted at his trial and concluded that it did "no more than create a suspicion or conjecture that the Waller sisters may have played a role in Dashunda Armstrong's death." 366 Ark. at 118, 233 S.W.3d at 637.

Here, Conte did not offer any evidence to connect any of these third parties to the crime. Other than bare allegations, neither at the pretrial hearing nor at trial, did Conte proffer evidence to link any third party to the crimes. Further, the circuit court has broad discretion and, based on the record before us, the circuit court did not abuse its discretion. We affirm on this point.

IV. *404(b) Evidence: Swartz's 2002 Kidnapping*

For his fourth point on appeal, Conte asserts that the circuit court erred in allowing evidence regarding his kidnapping of Swartz. The State responds that Conte failed to preserve this issue for review and it is also without merit.

Prior to trial, Conte filed a motion for production of Ark. R. Evid. 404(b) evidence. The State responded that it might seek to introduce evidence that Conte had kidnapped Swartz. Conte made no written or oral motion in limine concerning this evidence before trial. During opening statements, both the State and Conte mentioned the kidnapping.

However, when the State began to question Swartz about the kidnapping during her direct examination, Conte objected, asserting that "I just wanted to lodge an overall objection to – –." The circuit court then ruled that the State was not allowed to go through the incident step-by-step but was only allowed to ask general questions:

> [W]e're not trying him on kidnapping. Let's don't go through that blow-by-blow, step-by-step. If you want to ask her some – – couple of general questions about what happened, what the result was, that's – – .
>  . . . .
>
> Let's move through it really quickly. I don't want to go into, you know, every detail.
>  . . . .
>
> Let's – let's get in and move on.

The record demonstrates that Conte made no further objection or argument regarding this issue. In addition to Swartz, five witnesses, Ashley, Trey, Clark, Gathright, and Brown all testified in detail regarding the kidnapping. Yet, Conte made only a general objection and did not apprise the circuit court of the precise issue he raises on appeal, which is that evidence of Swartz's kidnapping was more prejudicial than probative and that it should not have been admitted under Ark. R. Evid. 404(b).

A defendant must object at the first opportunity, and he must then renew his objection each time the issue is raised; otherwise, he has waived his argument regarding that issue on appeal. *Vaughn v. State*, 338 Ark. 220, 992 S.W.2d 785 (1999). To preserve an issue for appeal, a defendant must object at the first opportunity. *Holt v. State*, 2011 Ark. 391, 384 S.W.3d 498. A party who does not object to the introduction of evidence at the first opportunity waives such argument on appeal. *Id*. Consequently, Conte did not make a

SLIP OPINION

timely objection to the testimony regarding Swartz's kidnapping and he is now precluded from raising the issue on appeal. Furthermore, evidence that is merely cumulative or repetitious of other evidence admitted without objection cannot be claimed to be prejudicial. *Gonzalez v. State*, 306 Ark. 1, 811 S.W.2d 760 (1991); *Dumond v. State*, 290 Ark. 595, 721 S.W.2d 663 (1986)).

V.  *The Circuit Court Erred When It Overruled Numerous Relevancy Objections*

For his fifth and final point on appeal, Conte asserts that the circuit court erred in its ruling on five evidentiary issues regarding relevancy.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403 (2013); *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818. "The balancing mandated by Rule 403 is also a matter left to a circuit court's sound discretion, and an appellate court will not reverse the circuit court's ruling absent a showing of manifest abuse. *Croy v. State*, 2011 Ark. 284, 383 S.W.3d 367. The evidence should not be excluded under Rule 403 unless the defendant can show that the evidence lacks probative value in view of the risk of unfair prejudice. *Id.* The test of admissibility of evidence over an objection to relevancy is whether the fact offered into proof affords a basis for rational inference of the fact to be proved. *Grigsby v. State*, 260 Ark. 499, 507, 542 S.W.2d 275, 280 (1976). "Evidence may be independently relevant if it shows motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake.

*Smith v. State*, 2010 Ark. 75, 364 S.W.3d 443. Additionally, any evidence that is relevant to explain the act, show a motive, or illustrate the accused's state of mind, may be independently relevant and admissible. *Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006); *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000)." *Lard v. State*, 2014 Ark. 1, 9, 431 S.W.3d 249, 258. It is sufficient if the fact may become relevant in connection with other facts, or if it forms a link in the chain of evidence necessary to support a party's contention. *See Grigsby*, *supra*. Finally, relevant evidence is any evidence which aids in establishing the guilt or innocence of the accused, even though only a slight inference can be drawn from the evidence.

A. Conte's Statements That He Was a "Mercenary" and Traveled Abroad to Kill Foreign Officials

Conte asserts that the circuit court erred in allowing Swartz's testimony regarding statements Conte had made regarding being a contract killer, testimony regarding Conte's statements that he went by the alias "Paladine," testimony that Conte claimed to have been on special missions to Cambodia, and the introduction of Conte's dog tags. The State responds that, although Conte admitted to Barrett that his stories were "fantasy," the testimony and evidence was more probative than prejudicial because the evidence allowed the jury to understand Conte's motive and plan to control Swartz. Here, the evidence was relevant to Conte's plan and mental state. Based on our standard of review, we cannot say the circuit court erred.

B. The Cleanliness of Conte's Residence in Carson City, Nevada and Cabin in Duck Creek, Utah

Next, Conte asserts that the circuit court erred by allowing testimony regarding the lack of cleanliness at his homes. Conte claims that the evidence was not probative and was offered only to prejudice Conte. A review of the record demonstrates that the testimony at issue occurred during Swartz's description of Conte's homes in connection with questions regarding the deterioration of their relationship. Thus, the evidence was relevant to Conte's mental state, plan and motive. Based on our standard of review, we do not find error.

C. A Phone Call to Swartz from Conte Where He Represented That He Was in a Firefight in Afghanistan

Conte asserts that Swartz's testimony, over his objection, regarding a phone call Conte made where she could hear gunfire in the background and Conte told her he was in Afghanistan and pinned under an SUV and was calling to tell her he loved her for possibly the last time, was erroneously admitted. The State responds that the ruling was not erroneous because the testimony was relevant to Conte's mission to regain Swartz, and "win her back," and was connected to the murders because it was all part of his plan to regain Swartz. Further, the State responds that the same testimony was admitted during Clark's testimony, without objection. Evidence that is merely cumulative or repetitious of other evidence admitted without objection cannot be prejudicial. *Wedgeworth v. State*, 2012 Ark. 63, at 5 (citing *Eliott v. State*, 342 Ark. 237, 242, 27 S.W.3d 432, 436 (2000)). This court will not reverse an evidentiary decision by the trial court in the absence of prejudice. *Marks v. State*, 375 Ark. 265, 269, 289 S.W.3d 923, 926 (2008). Here, the evidence was relevant to

demonstrate Conte's state of mind, plan, and motive. We hold that the circuit court did not abuse its discretion in allowing the testimony under Rule 403.

D. Emails Alleged to Have Been Authored by Conte From Swartz's Email Account

Conte next asserts that the circuit court erred by allowing evidence that Conte sent emails to friends, family members, and co-workers that Swartz had slept with a man, then murdered him and fled to Mexico. The State responds that the emails showed Conte's state of mind and were relevant. The State further responds that any error was harmless because the same testimony came in through two other witnesses, Ashley and Gathright, without objection. We agree that the evidence was relevant to prove Conte's plan, motive and state of mind. Evidence that is merely cumulative or repetitious of other evidence admitted without objection cannot be prejudicial. *Wedgeworth*, *supra*. This court will not reverse an evidentiary decision by the trial court in the absence of prejudice. *Marks*, *supra*. We hold that the circuit court did not abuse its discretion.

E. Introduction of Numerous Firearms, Magazines, Ammunition and a Book Called "The History of Torture and Executions"

Conte also asserts that the circuit court erred when, over his objection, it admitted evidence of a book titled "The History of Torture and Executions" that was seized from his home in 2002. Conte contends that there was no relevancy to offering the book and it was introduced to inflame the jury and prejudice Conte. The State responds that the testimony at trial demonstrated that the victims had been executed and this evidence was thus, relevant. During trial, the State contended that "these items collectively show that [Conte] possessed the tools, ability and knowledge" to commit the murders. The record demonstrates that

Erickson testified that there was an "element of these two individuals being in—under the control of another individual . . . at the time of their death."

This court rejects the admission of inflammatory evidence where claims of relevance are tenuous and prejudice is great, and expects the trial court to carefully weigh the probative value of photographs against their prejudicial nature. *See Camargo v. State*, 327 Ark. 631, 637–38, 940 S.W.2d 464, 467 (1997) (holding that we require the trial court to first consider whether such evidence, although relevant, creates a danger of unfair prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value); *see also Beed v. State*, 271 Ark. 526, 609 S.W.2d 898 (1980). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403. Evidence is admissible if it tends to shed light on any issue, to corroborate testimony, or if it is essential in proving a necessary element of a case, is useful to enable a witness to testify more effectively, or enable the jury to better understand testimony. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Here, an essential element of the offenses charged was intent; to secure a conviction for capital murder, the State had to prove that appellant caused the victims' deaths with a premeditated and deliberated purpose. The State offered two books, "Quiet Killers, Silenced Weapons in War and Espionage" and "The History of Torture and Executions," to show Conte's knowledge and ability to commit the crimes. Moreover, the record reveals that the titles of the books were introduced but no portions of the books were read to the jury and no witness testified as to the content of the books. Because the books were relevant to prove an element of the

State's case, we hold that the circuit court did not abuse its discretion in admitting this evidence and affirm the circuit court on this point.

This case involves a sentence of life imprisonment without parole; therefore, it is subject to review under Arkansas Supreme Court Rule 4–3(i). As required under Ark. Sup. Ct. R. 4–3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Conte, and no prejudicial error has been found.

Affirmed.

Special Justice ALVIS NOYL HOUSTON joins in this opinion.

HART, J., concurs.

WOOD, J., not participating.

**JOSEPHINE LINKER HART, Justice, concurring.** I write separately because, although this case must be affirmed, I am concerned that Dr. Conte may not have received a fair trial. I am most troubled by two points: the delay in bringing the case to trial and the circuit court's prohibiting Dr. Conte from presenting a "*Zinger*" defense. However, as argued, these points do not compel this court to reverse this case.

First, Conte asserted that the death of his alibi witness, Pringle, constituted prejudicial delay that warranted the dismissal of the information. He noted that in *Scott v. State*, 263 Ark. 669, 566 S.W.2d 737 (1978), this court held that prejudicial delay in bringing charges can violate a defendant's right to due process, and the charges should be dismissed unless the State comes forward with a "satisfactory reason" for the delay. He asserts that here, the circuit

SLIP OPINION

court "essentially signed off on Barrett (the investigating officer) shopping the case to three different prosecutors." Conte notes that no additional evidence was found prior to bringing the charges. He contends that Hiland's decision to bring the charges was related to his campaign for prosecutor. Conte points to the fact that Elliot's daughter, Ashley Waldron, appeared in a televised campaign commercial for Hiland, and although the circuit court dismissed it as not relevant to bias, Conte contends that it violated fundamental fairness.

The fact that Hiland chose to bring the case, when his predecessors decided against it, cannot support reversal of this case. That situation can be ascribed to Hiland's being more aggressive than the men who preceded him in office. The problem with this argument is that Dr. Conte's only claim of prejudice was the death of a single alibi witness, Pringle, whose account of Dr. Conte's whereabouts fell far short of proving that Dr. Conte was not at the crime scene. Moreover, Pringle's statements regarding Dr. Conte's location could have been introduced through other witnesses.

In my view, the prejudice lay in the fact that over the nine years between the commission of the murders and the filing of the charges against Dr. Conte, the statements of other potential suspects simply disappeared from the police files. This "missing" evidence includes the taped statement made by alleged bookmaker Raymond Merrill, who broke Carter Elliott's jaw before the murder; Joe Garrison, who allegedly engaged in high-stakes gambling with Elliott and to whom Elliott owed $50,000; Danny Cook, a man who had confronted Elliott about having an affair with his wife; and Dan West, an employee of Elliott's who was terminated a week before the murders and had allegedly threatened to kill Elliott if

36

he were fired. Also, Jackie Dumaglosky, the man who had reported West's, threat could not be located and was believed to have moved out of state. The spoliation of potential exculpatory evidence—if argued—could have made a more compelling argument. This is particularly so in this case, because no evidence, save the testimony of two jailhouse snitches, put Dr. Conte anywhere near the crime scene at the time of the murders.

The second point that causes me significant concern was how Dr. Conte's appellate counsel challenged the circuit court's denial of his *Zinger* defense. Prior to trial, the State filed a motion to preclude Dr. Conte from inferring that others had committed the murders. They sought to exclude testimony about Danny Cook, Raymond Merrill, Joe Garrison, and Dan West. The State prevailed on its motion

On appeal, Dr. Conte argues that the motion in limine prevented him from being able to present a complete defense. However, he undercuts this argument by asserting that the *Zinger* standard that the circuit court relied on was "too narrow." In *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320, the supreme court held that the standard for admissibility of evidence tending to incriminate other persons in the crime being charged is as follows:

> A defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.

*Zinger*, 313 Ark. at 75-76, 852 S.W.2s at 323 (quoting *State v. Wilson*, 367 S.E.2d 589 (N.C. 1988)). This argument was inefficacious because the *Zinger* rule was expressly upheld by the Supreme Court of the United States in *Holmes v. South Carolina*, 547 U.S. 319 (2006). Essentially, Dr. Conte's appellate counsel was conceding that the circuit court's ruling

followed the binding precedent of this court and of the Supreme Court of the United States.

I note that the case before us did not present a typical *Zinger* situation in which the identity of the third person is unknown and completely speculative. *Zinger* involved proffered testimony concerning another crime of a similar nature that occurred after the appellant had been arrested for the crime he was being tried for, the implication being that the perpetrator of the subsequent crime committed both. *Zinger*'s closest progeny, *Birts v. State*, 2012 Ark. 348, likewise involved a healthy dose of speculation about an unknown perpetrator. In *Birts*, the defendant wished to introduce forensic evidence contributed by an unknown person other than the defendant that was found in the victim's apartment and vehicle.

While it is true that *Zinger* seems to require an evidentiary link that points directly to the guilt of a third party, in *State v. Harrison*, 2012 Ark. 198, 404 S.W.3d 830, this court held that a direct link was established by a third party's testimony. Likewise, in *Harmon v. State*, 2014 Ark. 391, 441 S.W.3d 891, testimony that a third person was in possession of Harmon's car at the time of the murder established that direct link.

I submit that *Zinger* is not the impediment to Dr. Conte prevailing on appeal, rather it is a case that purports to be *Zinger*'s progeny, *Armstrong v. State*, 366 Ark. 105, 233 S.W.3d 627 (2006). On appeal, the State cites *Armstrong* as authority for upholding the circuit court's ruling. The *Armstrong* court stated:

> Armstrong also contends that the circuit court erroneously excluded evidence he wanted to present of controversies between Kim Waller and her sisters and the victim, including an audio tape which contained statements by the Waller sisters threatening to kill Dashunda Armstrong. He claims that the circuit court erroneously construed *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993), as requiring that evidence of another's guilt could only be presented where it pointed directly to the

other perpetrator's guilt. He asserts that he had the names of all three Waller sisters who had threatened his wife; records of the violent encounters between the women including a court case; records from the prosecutor's office that showed mutual harassment between Mrs. Armstrong and Ms. Waller; and the presence of Kim Waller at the crime scene the night of the murder. He urges that the circuit court trammeled his Fourteenth Amendment right to due process and a fair trial by denying him the opportunity to have the jury decide whether the evidence of Mrs. Armstrong's battles with the Waller sisters cast a reasonable doubt on the prosecution's theory that he perpetrated the murders.

. . . .

While Armstrong possessed a tape which contained the voices of several Waller sisters threatening Mrs. Armstrong and evidence that Armstrong's wife and several of the Waller sisters had harassed one another, he presented no direct or circumstantial evidence which connected any of the Waller sisters to his wife's death. As the State points out, two of the Waller sisters, Karen and Yolanda, whom their sister Kim identified as being the voices on the tape sought to be admitted by Armstrong, were in Forrest City the night of Dashunda Armstrong's murder, according to Karen's and Kim's testimony presented to the circuit court. In addition, despite Kim Waller's presence in the area of the crime scene the night of the victim's death, Armstrong failed to connect her presence with the possibility of her guilt, especially when she testified that she was only in the area because she received a cellular telephone call from Armstrong to come pick him up.

To be admissible, this court has held that there must be a sufficient connection between the evidence that a third party may have committed the crime and the possibility of another person's guilt. *See Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996). While Armstrong claims that *Zinger* permits evidence of another's connection to the crime, he is mistaken. The *Zinger* court was exceedingly clear that any evidence pertaining to the possibility of a third-party's guilt in the crime charged must point directly to the guilt of the third party. *See, e.g., Echols v. State, supra.* Because the evidence pointed to by Armstrong does no more than create a suspicion or conjecture that the Waller sisters may have played a role in Dashunda Armstrong's death, the circuit court did not abuse its discretion in rejecting the evidence.

*Armstrong*, 366 Ark. at 116–18, 233 S.W.3d at 636–37.

In my view, *Armstrong* was wrongly decided. However, in *Armstrong v. State*, 373 Ark. 347, 284 S.W.3d 1 (2008), the Rule 37 case, far from retreating from the erroneous holding,

this court compounded the error by declining to correct the mistake and held that the direct appeal comported with *Zinger* and thus with *Holmes v. South Carolina*, 547 U.S. 319 (2006). I note that *Holmes* held that the exclusion of defense evidence of third-party guilt denied defendant a fair trial. It is a case that favors *admission* of this type of testimony. *Armstrong* stands *Holmes* on its head. *Armstrong* sanctions the very procedure, which was employed in the case before us, that *Holmes* found unconstitutional. This misstep in our *Zinger* jurisprudence was not challenged on appeal. While I am mindful that a circuit court has broad discretion on whether to admit or exclude evidence, that discretion does not extend to denying a defendant a fair trial.

*Benca & Benca*, by: *Patrick J. Benca*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.