WAYMOND M. BROWN, Judge
A Benton County jury found appellant Joseph Thomas Lacefield guilty of two counts of robbery and one count of aggravated robbery. He was sentenced to an aggregate term of thirty years' imprisonment. He argues on appeal that (1) the trial court erred by allowing gloves and testimony of the gloves into evidence, (2) the trial court erred by allowing two notes into evidence, and (3) the evidence was insufficient to support his convictions. We *314 affirm.[1]
In case number 04CR-14-821, appellant was charged with the robbery of TownePlace Suites in Bentonville on or about May 15, 2014. According to Timothy Dye, he was at work at the hotel on May 15, 2014, when a man came in around 1:00 a.m. with a "big fake beard up to his nose a" blue rain jacket, blue jeans, and white shoes. He stated that the man handed him a Walmart sack and told him to place money into it. He testified that he asked the man whether he was for real and threatened to call the police. He stated that at that time, the man slid over the handicap portion of the desk and showed Dye a taser. Dye placed the money in the bag and the man slid back over the desk and slowly walked out. He testified that he initially told the police that the man was about 6'2" tall, but that he has a friend who is 6'4" tall and that the man appeared about that height. Dye stated that the man did not threaten him with the taser. He described the man as having "a really sharp nose with defined eyebrows and really dark-colored brown eyes." He said that he was presented with a photo lineup by the Bentonville Police Department and that when he looked at the photo of appellant, he "could see the same eyes, the same color of eyes and [he] was sure it was him."
On cross-examination, Dye stated that he remembered speaking to Officer Chris Gravely and that he "supposed" he told Gravely that the suspect was "6'3 and had a slender build," but that "he wasn't skinny at the time." He admitted that before being presented with the photo lineup, he had already described the suspect as being "an older gentleman, in his 40's." He testified that the suspect pulled the taser out of his pocket with his left hand and that the suspect's right hand never touched the taser. He said that although he watched the suspect leave after the robbery, he did not see the suspect get into a truck.
Officer Scott Fry with the Rogers Police Department stated that he was on duty on May 15, 2014. He stated that there was a BOLO sent out for a robbery suspect with "a fuzzy picture of a vehicle from a surveillance photo from an earlier robbery on Springdale."[2] He stated that the truck in the picture had extensive damage to the passenger's[3] side of the truck. He testified that he saw a green Chevy or GMC pickup at around 1:00 a.m. traveling east on Pleasant Grove over the interstate, which matched the BOLO. He stated that he did a U-turn and followed the vehicle to the Walmart off Pleasant Grove, where the vehicle pulled into a parking spot. He said that he stopped in the middle of the parking lot and radioed for assistance. He testified that he waited until the other officers showed up before he made contact with the driver, appellant. He said that appellant stepped out of his vehicle and was questioned. He stated that he did not search appellant's vehicle but that he "did kind of look inside the window and got appellant's information in case it turned out to be a lead or not." He said that he *315 did not see a blue raincoat in appellant's truck but that he did see a blue coat. He testified that when he came in contact with appellant, appellant was using a cane and spoke of back or knee problems. He further stated that the "BOLO mentioned the suspect had jumped the counter of the business he had robbed and ran off, so it didn't add up enough for [him] to ask [appellant] for consent" to search the vehicle.
On cross-examination, Officer Fry stated that the stop occurred at 1:04 a.m. on May 15, 2014. He testified that he did not recall seeing a fake beard, a blue raincoat, or a taser in appellant's truck at that time. On redirect examination, Officer Fry testified that he did not open the door of the truck and physically enter it, but that he just shined his light through the window to look inside. He stated that he was about twenty yards from appellant's vehicle during the five minutes he waited for the other officers to arrive. He said that appellant did not get out of the vehicle while the other officers were en route. He stated that appellant should have been aware of him because he was in a marked police car sitting twenty yards away from appellant.
In case number 04CR-14-1460, appellant was charged with the robbery of Dollar General in Rogers, on or about May 8, 2014.[4] According to Oscar Linares, a man walked into Dollar General with a "camo hoody pulled over his head, jeans and a fake beard." He stated that he really did not take notice of what the man was wearing because it was raining outside. He said that he greeted the man and that the man asked for two packs of Marlboro Red Special Blend cigarettes. He asked the man for identification, and the man asked him for a sack. He stated that the man went and "grabbed some tasty cakes and brought them back to the register and slipped [Linares] a note saying don't say anything, just give me the money." Linares said that he placed the money from the register into the bag the man gave him. He stated that the man told him not to come outside and then left. He testified that based on the tape by the door of the store, the suspect was about 6'2" tall. He stated that the man was holding a small taser during the robbery and that he did not feel like getting tased so he did what was asked of him. He said that he could not see the suspect's mouth but that he could remember the fake beard and the suspect's eyes.
On cross-examination, Linares stated that he worked at Dollar General for about six months and that Marlboro Red cigarettes were a popular brand of cigarettes. He said that the suspect removed the taser from his left pocket and held it in his left hand.
In case number 04CR-15-69, appellant was charged with the aggravated robbery of Pizza Hut in Rogers on or about November 17, 2013. According to Samantha Inglis, on the night of November 17, 2013, an armed man walked into the store and told her to give him all of the money the store had. She stated that she placed the money into a "clear portion bag" and laid on the floor as she was instructed. She said that the man was using a small caliber semiautomatic handgun. She stated that she could not recall if the man was wearing gloves because she was focusing on the gun and trying to remain calm. She testified that after the man left, she got up, locked the door, and called the police. She stated that when she was shown a photo of appellant, his eyes made her "freeze" and *316 "cry", reminding her of the fear she felt that night.
On cross-examination, Inglis stated that she did not see the suspect get into a vehicle when he left. She said that she described the suspect to the police as being approximately 6'1" tall and weighing 170 pounds. She testified that the suspect had a "reddish beard and a cap pulled down on his chin" and was wearing "a hunting jacket, not a rain coat." She again said that she did not remember seeing gloves.
On redirect examination, Inglis testified that she was able to identify a ski mask worn by the suspect the day after the robbery. She stated that the suspect wore an olive-green ski mask that covered his face; however, she said that his eyes and mouth were visible.
Bobby Ryan, a locksmith and safe technician for Our Keys, testified that the business is located close to the Pizza Hut that was robbed. He stated that he learned in November 2013 that the Pizza Hut had been robbed and that the next day while taking out the trash, he "saw some material and gloves and scarf in the dumpster and called the detective." When asked, again, what did he recall seeing in the dumpster, the defense objected, stating in pertinent part:
MR. HOGUE : Judge, he - he just testified to seeing the gloves and I - and-other items located there. I'm going to object to lack of foundation of any more testimony regarding the gloves.
The victim was on the stand. She did not provide any testimony or evidence that there were any gloves ever used in the commission of the crime. I think the testimony regarding the gloves is also - any probative value it's going to have is far outweighed by any prejudicial effect, and I don't think we've, one, laid a foundation for the gloves being used in the commission of the crime. I don't think he can testify to it at this point.
THE COURT : Overruled.
MR. CEARLEY : Thank you.
Ryan stated that he did not touch any of the items in the dumpster but closed the lid and locked it back up. He testified that he was the only one who had access to the dumpster and that it was kept locked. However, he stated that it could still be raised three to six inches while locked. He said that he was last at the dumpster one to three days before finding the items and that he did not put them there.
Detective Nick Torkelson of the Rogers Police Department testified that he worked the Pizza Hut aggravated robbery in November 2013. He stated that there were not any surveillance videos located at Pizza Hut. He testified that the day after the robbery, he was dispatched back to the scene after Ryan called the police. He said that he talked to Ryan and then located the items in the dumpster. He stated that the mask and a pair of gloves that were found looked as if they had been "crumpled up together and thrown in the dumpster." He then identified both the mask and the gloves found in the dumpster. When the State attempted to admit the gloves into evidence, the defense objected.
MR. HOGUE : There has not been a foundation laid tying the gloves to the scene of the crime.
THE COURT : Objection is overruled. State's Exhibit # 8 is admitted.
Detective Torkelson stated that after he collected the items from the dumpster, he logged them into the evidence room and subsequently took them to the crime lab.
On cross-examination, Det. Torkelson stated that none of the fingerprints recovered from Pizza Hut matched appellant's. He said that he interviewed numerous people and that there were a number of people *317 who were considered persons of interest.
On redirect examination, Det. Torkelson testified that he was able to eliminate McKenzie Moran as a suspect after interviewing Moran and running his DNA. He stated that the only identifiable fingerprint found in Pizza Hut was from Daniel Keenan, an employee.
On recross-examination, Det. Torkelson stated that based on the description given by Inglis, they were looking for a suspect who was 6'1" tall and weighed approximately 170 pounds.
Detective Torkelson was recalled to the stand later during the trial and testified that Moran is 5'11" tall and 240 pounds. He testified on cross that appellant was 6'4" tall and weighed 245 pounds at the time of his arrest.
In addition to the above testimony, other pertinent evidence was heard by the jury during appellant's trial. Tyler Leis testified that he worked at a different Dollar General in Rogers in May 2014. He stated that on May 1, 2014, "a weird man wearing a fake beard walked in." He also said that the man was wearing a "big heavy coat with his hood on" on a warm day. He described the man as being about 6'2" tall. He testified that the man attempted to purchase cigarettes but that he could not sell them to him because the man did not have his identification with him. He stated that after appellant was arrested, he went online and looked at appellant's picture and that "his eyes specifically stood out." He testified that he did not notify the police but that they "showed up at [his] door and [he] talked to them about it." There was video surveillance at Dollar General, and it was admitted without objection.
Larry Roberts testified that he rented a house to appellant in the summer of 2013. He stated that appellant did not have a job when he rented the house but told Roberts that he had some interviews lined up. He testified that appellant paid three months' rent in June when he signed the lease. He stated that appellant was three days late with his rent payment in October; paid significantly late in November; paid on time December through March; paid late in April; and paid a couple of weeks late in May. He said that appellant promised "to have some money soon in early May" and that appellant paid $650 on May 15, 2014.
On cross-examination, Roberts stated that he mainly dealt with appellant on the phone and only saw him occasionally after June 2013. However, he said that he saw appellant in April 2014 and that he was "heavier" than he appeared in court.
Sherry Nickerson testified that she worked at Any Y Liquors in Springdale and was working on May 9, 2014. She stated that on May 9, "someone walked in wearing what looked [like] a carpet beard over his whole entire face." She said that the person came in and "watched" them for a while. She stated that the man was tall enough to see over the aisle, which she found intimidating. She testified that she called the police after the man left because she "had read something on [her] phone about a man wearing a beard robbing a store in Rogers and [she] thought the description matched the man that had been in the store." She identified a photo taken of the man while he was in the store.
On cross-examination, Nickerson stated that her manager gave the police a bottle of liquor they believed the man had touched.
Rachel Case testified that she was enrolled at Career Academy of Hair Design in Springdale in May 2014. She stated that on May 14, 2014, she was sitting in the front learning how to "take appointments *318 and phone calls." She said that at approximately 5:55 p.m., a man came from the back parking lot wearing what looked like a piece of carpet as a beard. She stated that she greeted him, and that he pulled out a Walmart bag from his jacket, placed it in front of her, and directed her to put the money in the bag. She said she thought he was joking and asked him why. She testified that he again told her to put the money in the bag and to not draw attention to herself. She stated that as he directed her to put the money in the bag, he placed his hand into his "left pocket and brought it around and tried to make it look like he had a gun[.]" She said that she felt "terrified" because she "could have gotten shot at any moment." She stated that she could only see the man's eyes and the top part of his nose because he was wearing a navy-blue beanie and a fake beard. She said that he was also wearing a "heavy work-wear jacket," navy "work pants" and white tennis shoes. She testified that she saw a picture of appellant after his arrest and "immediately recognized his eyes." She stated that she "recognized the piercing nature of his eyes instantly when [she] looked at his mugshot and felt like [she] was back in school [with him] threatening [her] life." She said that there was a surveillance camera that spanned the front lobby but that appellant "never looked at the camera like he knew where it was."
On cross-examination, Case stated that she told the police the suspect was approximately 6'1" tall and weighed 180 pounds. She said that the man acted like he had a weapon in his left hand.
Sergeant Brad Abercrombie of the Rogers Police Department testified that he was on regular patrol on the midnight shift on May 14, 2014. He said that he was aware of a robbery that had occurred at Career Academy of Hair Design in Springdale. He stated that photos of the suspect's vehicle were forwarded to his department in a BOLO. He said that he saw a vehicle that matched the description around 11:00 p.m. in the IHOP parking lot while he was on patrol that night in the area of 46th Street and Walnut. He testified that he was able to get the tag number off the truck. He stated that the truck then pulled into the Denny's parking lot, and he was able to see that it was driven by a single male driver. He said that he did not notice any distinguishing features about the driver. He stated that he did not have a reason to stop the truck, so he went back to the station and ran the tag. According to Sgt. Abercrombie, the truck was registered to appellant. He said that he sent an email to the detective working the case telling him the information he had, but subsequently learned about the Bentonville robbery.
James Bruno testified that he worked at Cabela's in firearms. He stated that he and appellant used to work together at Cabela's. He said that he had been to appellant's house and "messed with firearms." He testified that appellant had seven firearms, mainly rifles, one shotgun, and two handguns. He stated that appellant texted him on May 15, 2014, and wanted to bring him some of appellant's firearms "to prevent them from being stolen." He testified that appellant gave him the seven firearms. He also said that he received a text from appellant on May 1, 2014, stating that "he was sinking financially. But he would be out of it by tonight" or something like that.
Troy Grant testified that he was appellant's neighbor before appellant's arrest. He stated that appellant was previously "in the military and that he was a police officer in Florida or some sort of MP for the military." He said that he knew appellant was having money issues in the spring of 2014 because appellant's utilities kept getting cut off and appellant's daughter *319 had to come to Grant's house to charge her phone, wash clothes, and take showers. He stated that appellant told him in May 2014 that a neighbor had seen someone place a device underneath his truck, but he had removed it and hid it. He testified that he helped appellant's brother remove appellant's things from the house after appellant's arrest. He stated that appellant's daughter was already living with his family because approximately a week before appellant's arrest, appellant asked the Grants to take care of her. Grant testified that there was a computer bag in his home that belonged to appellant. He stated that several notes were found inside the bag. He identified two notes found inside the bag: one was a handwritten note and the other was typed.[5] When the State moved to introduce the notes, the defense objected:
MR. HOGUE : I am going to object because they are not relevant and there is a lack of foundation tying these documents to my client and I think they're hearsay. No one said who actually drafted these documents.
THE COURT : I'll allow them to lay a further foundation.
MR. CEARLEY : I think he just testified that the letters came from Joe's computer bag, there's no other foundation. Mr. Hogue's argument is really a weight argument and not an admissibility argument.
THE COURT : I don't know what the notes are going to say.
MR. CEARLEY : They discuss how to commit a robbery. So his argument if they're relevant is misplaced. The foundation is simply that they are what I purport them to be. He's laid that foundation. His argument is a weight argument.
MR. HOGUE : I'll add that there's a valid 403 objection. The notes deal with research for a robbery, specifically bank robberies. There's no evidence my client committed any bank robberies. I think any probative value is severely outweighed by the prejudicial effect they have.
THE COURT : They are relevant and a foundation was properly laid and they are Rule 404(b) evidence of intent, motive, preparation. I am going to allow them.
Grant stated that he turned the letters over to the police in August. He also said that he called the police in May to help with the investigation by informing them that appellant had a blue raincoat.
On redirect examination, Grant testified that he turned the letters over as soon as he found them.
Brian Culpepper, a crime-scene investigator with the Rogers Police Department, testified that he was the investigator in May 2014 and worked on the "bearded bandit robberies." He said that he collected items at Dollar General pursuant to a search warrant. He stated that he retrieved surveillance from that robbery and was able to collect nine fingerprints. He said that a few days later, he received a bottle of Goldschlager from Det. Slaven in Springdale, which was believed to be touched by the "bandit" at Y Liquor. He stated that he also processed cell phones from the Pizza Hut robbery. He testified to collecting evidence from appellant's truck, including a couple of maps (restaurant map; city map of Bentonville, Centerton, Little Rock, Rogers, Lowell, Cave Springs, and Fort Smith with a map of Northwest Arkansas and Springdale, Johnson, and Fayetteville on the back) and a pack of Marlboro Special Blend 100's that had the lot number missing from it.
*320 He also stated that he helped collect evidence from appellant's residence including four or five pairs of white tennis shoes.
On cross-examination, Culpepper stated that he was not able to match the fingerprint he found on the bottle of alcohol to appellant. He said that he was unable to positively identify any of appellant's shoes as being the ones used in the crimes. He stated that he did not collect any handguns or tasers from appellant's residence.
Detective Larry Taylor of the Rogers Police Department testified that he assisted with both the Pizza Hut and Dollar General cases and, as a result, came in contact with appellant. He stated that he interviewed appellant on May 19, 2014, and asked him about his truck being used in some crimes that had occurred in Rogers. He testified that appellant told him that he had only been driving his truck for the past three days, and prior to that, he had been driving a Subaru. Detective Taylor said that he showed appellant some photos of the suspect's vehicle with damage to the front passenger fender and appellant "said it could possibly be his truck." According to Det. Taylor, appellant told him that appellant had recently moved to the area and "maybe a neighbor of his had borrowed his truck using the key he hid under a trailer at his house."
On cross-examination, Det. Taylor stated that he had gone to several stores to see if appellant had purchased a fake beard from those stores, but that he never found any evidence of such a purchase by appellant. He testified that he assisted with the execution of a search warrant of appellant's home on May 19, and that he did not find a black handgun or a fake beard at appellant's home. He explained that he interviewed appellant as the other officers searched appellant's home.
Detective Brian Hanna of the Rogers Police Department testified that he assisted Det. Slavens and other officers in the Dollar General and Pizza Hut robberies with cell phone records. He stated that he had taken basic cell-phone-forensics classes and worked several cases where cell-phone towers were utilized. He said that he obtained appellant's cell-phone records and was able to determine that appellant was (1) in an area near the Dollar General when Leis had the encounter with the bearded man on May 1; (2) in the area near the Dollar General on May 8 around the time of the robbery; (3) in the area of Y Liquor on May 9 around the time a call came in about a suspicious person; (4) near Career Academy of Hair Design on May 14 around the time of the robbery; and (5) near TownePlace Suites on May 15 around the time it was robbed.
On cross-examination, Det. Hanna stated that he had no knowledge if appellant was ever inside the stores when they were robbed. He admitted that he did not even know if it was appellant that was making the phone calls. He said that he was just showing that appellant's phone was being used in the triangle area.
Sergeant Jared Slavens of the Rogers Police Department stated that he helped work the Dollar General robbery and had a tracker placed on appellant's vehicle on May 15. He said that on that same day, Officer Fry made contact with appellant twelve minutes after the Bentonville robbery. During his testimony a video from the Dollar General where no robbery occurred was introduced into evidence. It showed a man coming in wearing blue jeans, white shoes, a dark colored jacket, a fake beard, and a hood coming in at the 15:23 mark, and leaving at the 15:24 mark. When compared to the May 8, 2014 robbery at the other Dollar General, Sgt. Slavens stated that it appeared to be the same subject as the other Dollar General video.
*321 On cross-examination, Sgt. Slavens testified that it was reported that the robber at Dollar General removed a taser from his left pocket and held it with his left hand. He stated that he was the lead detective in the investigations and was at the scene. He said that there were no fingerprints, footprints, or DNA evidence collected at any of the scenes that matched appellant. He testified that he did not collect any fake beards, guns, or tasers from appellant's home. He stated that he prepared an arrest affidavit for appellant and referred to the TownePlace Suites incident on May 15. He said that he wrote in his report that the suspect left in a dark-colored truck, possibly a Chevy Avalanche.
Benaiah Townsend of the Springdale Police Department testified that she investigated the robbery of Career Academy of Hair Design in the spring of 2014. She stated that she knew about "an encounter with a suspicious individual prior to the robbery at Y Liquors in Springdale and obtained surveillance footage from that location." She also stated that she received surveillance footage from Career Academy of Hair Design, from the businesses located to the east and west of the academy, and from TownePlace Suites. She testified that the surveillance showed that the suspect's vehicle was a full-sized Chevrolet or GMC pickup truck with a Z71 emblem on it. She stated that the driver was "wearing darker clothing."
On cross-examination, Townsend stated that she was not able to identify a license plate on the vehicle.
Officer Brian Parmenter of the Bentonville Police Department stated that he responded to the robbery at TownePlace Suites in May 2014. He testified that he processed the scene for evidence by lifting fingerprints, swabbing for DNA, and collecting surveillance. He said that he subsequently came up with appellant as a suspect based on "some encounters with Rogers Police Department and a similar vehicle used in a Springdale robbery." He testified that he placed a picture of appellant in a photo lineup to show Dye. He testified that Dye identified appellant as the person that robbed him and indicated that he "could see [appellant] squinting at [him] now."
On cross-examination, Officer Parmenter stated that by the time Dye was presented with the photo lineup, he had already told police that the robber was an older gentleman. He admitted that the police department was not able to positively match DNA evidence or fingerprints to appellant. He also stated that no one ever reported seeing the suspect leave the scene in a vehicle.
Wesley Sossamon, a certified latent-print examiner with the Arkansas State Crime Lab, testified that none of the prints found at Pizza Hut or Dollar General matched appellant's. However, he stated that there were "a lot of factors that affects the ability to get a latent print. It is not surprising that items touched by a person could not produce prints." He stated that he was not able to reach "a conclusive comparison" on items examined from TownePlace Suites.
On cross-examination, Sossamon stated, "Out of everything tested by the lab we were not able to [identify appellant's] prints on anything. They are definitely not his prints."
Lisa Channel, a criminalist at the Arkansas State Crime Lab, testified that she examined some tape lifts and hairs found from the ski mask and a pair of gloves. She stated that the mask had hairs with roots that could be tested for DNA, but that the gloves did not.
Kelli Dixon, a forensic DNA examiner at the Arkansas State Crime Lab, testified *322 that she was unable to get a DNA profiled from the hairs submitted from the ski mask. However, she stated that she was able to get a DNA profile from cuttings she received from the gloves and that the DNA matched appellant.
On cross-examination, Dixon reiterated that she was able to identify appellant's DNA on the gloves, not the ski mask.
The following motion for directed verdict was made at the conclusion of the State's case:
MR. HOGUE : In case CR 15-69-1, in regards to one count of aggravated robbery the [S]tate failed to put forth sufficient evidence to send this case to a jury and/or convict my client. Specifically, the only piece of evidence that has be presented tying my client to the scene is the DNA from the gloves. The clerk could not identify that my client was wearing gloves. Her identification of the defendant was not by physical description and there was no evidence that put the defendant in the area at the time. The State has not put forth sufficient evidence to meet their burden.
With regards to case CR 14-1460-1, the robbery charge at Dollar General, the State has failed to put forth sufficient evidence to convict the Appellant of the chargers. Specially, the State was not able to provide any evidence of the costumes, the beards that were seen in the video. The physical descriptions of the perpetrator and my client do not match. No one has placed my client or my client's vehicle at or near the scene of the crime. The [S]tate has not put forth sufficient evidence to meet their burden.
In [r]egards to case CR 14-0821-1, the robbery of TownePlace Suites in Bentonville, the State has failed to put forth sufficient evidence to convict my client. The physical description of the perpetrator and my client do not match. No one can place my client or his vehicle at or near the scene. The State presented evidence that the robbery was carried out by a man with a beard, wearing a raincoat and carrying a Taser. The [S]tate has presented no evidence that my client ever owned, possessed at that time or any time the clothing items used during the robbery. The [S]tate has not put forth sufficient evidence to meet their burden.
MR. CEARLEY : As to the aggravated robbery there are two compelling things. First, we have Mr. Lacefield's DNA on a pair of gloves that according to Detective Torkelson with a ski mask that the victim identified was used during the robbery. Furthermore, the victim testified that when she saw a photograph of Mr. Lacefield, she recognized his eyes. I believe we have sufficient evidence to go forward to a jury.
As for the May robberies, first it is clear it is the same person doing these robberies. It is the same M.O. and on the videotapes, it appears to be the same person, same stature, same build, and same coat in a couple of them actually.
THE COURT : The motion for a directed verdict is denied.
Appellant renewed his directed-verdict motion at the conclusion of all the evidence. The court denied the motion and appellant was found guilty of the charges against him. He was sentenced to an aggregate term of thirty years in the Arkansas Department of Correction. He filed a timely notice of appeal.
On appeal, appellant argues that there was insufficient evidence to support his convictions. Although appellant raised this issue as his last point on appeal, double-jeopardy considerations require this court to consider a challenge to the sufficiency of the evidence prior to the other *323 issues on appeal.[6] In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict.[7] We will affirm a conviction if substantial evidence exists to support it.[8] Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture.[9]
Appellant was found guilty of robbing TownePlace Suites on May 15, 2014. A person commits robbery, if, with the purpose of committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person.[10] Physical force is any threat of any bodily impact, restraint, or confinement.[11] Appellant's directed-verdict motion, as well as his argument on appeal, is that the State failed to put forth evidence to place appellant or his vehicle at or near TownePlace Suites at the time of the robbery. Appellant further contends that the State failed to put forth evidence linking appellant to the clothes and beard worn by the robber and that Dye's physical description of the robber does not match appellant. This argument is without merit. Dye positively identified appellant as the person that robbed TownePlace Suites on May 15, 2014. Our supreme court has consistently held that unequivocal testimony identifying the appellant as the culprit is sufficient to sustain a conviction.[12] According to Dye, when he looked at the photo of appellant in the lineup, he could tell by the eyes that appellant was the person that robbed him. Dye told officers that he thought the suspect was in his forties[13] and that the suspect "slid" over the handicap portion of the desk and demanded money, and slid back over it after getting the money and "slowly" walked away. Dye initially stated that the suspect was between 6'2-6'3" tall; however, he testified that the suspect was more his friend's height, which was 6'4". Appellant is 6'4". Additionally, Dye admitted describing the suspect as someone with a slender build but testified that the suspect "wasn't skinny at the time." Appellant was 245 pounds at the time of his arrest. Appellant's cell phone was placed in a triangular area near the robbery around the time of the robbery. He was stopped by officers not far from the robbery just minutes after the robbery had taken place; however, his truck was not searched at that time. The jury was presented with the testimonial evidence as well as surveillance of the robbery. The credibility of witnesses is an issue for the jury.[14] The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence.[15] Here, the jury believed that appellant was guilty of robbing TownePlace Suites, and substantial *324 evidence supports this conviction. Accordingly, we affirm.
Appellant was also found guilty of robbing Dollar General on May 8, 2014. Appellant argues, as he did below, that the State failed to introduce any evidence placing appellant or his vehicle at Dollar General at the time of the robbery; that the physical description given by Linares did not match him; and that the State failed to introduce any evidence linking appellant to any of the beards or costumes that were worn during the commission of the robbery. Linares positively identified appellant's photo as the person that robbed Dollar General. Although he could not see most of the suspect's face, Linares stated that the fake beard and eyes stood out on the suspect. Linares described the suspect to police as being 6'2" tall; however, this conflict was for the jury to resolve. Additionally, appellant's cell phone was near Dollar General around the time of the robbery, as well as, around the time of other sightings of the "bearded bandit." Substantial evidence supports this conviction. Therefore, we affirm.
Appellant was found guilty of the November 17, 2013 aggravated robbery of Pizza Hut. A person commits aggravated robbery if the person commits a robbery while armed with a deadly weapon.[16] Appellant contends that the State failed to introduce any evidence that gloves were worn during the Pizza Hut robbery and failed to introduce evidence that appellant was in the area at the time the crime was committed. Inglis positively identified appellant, by his eyes, as the person that robbed Pizza Hut on the night in question while wearing a mask and pointing a handgun at her. The day after the robbery, Ryan found a ski mask and gloves inside Our Keys's locked dumpster that had not been there the last time he checked the dumpster. Ryan immediately contacted the police and the evidence was removed from the dumpster by Det. Torkelson, who stated that the gloves and mask looked like they had been crumpled up together and thrown into the dumpster. Inglis was able to identify the ski mask as being the one worn by the robber; however, she could not recall the gloves because she stated that she was busy focusing on the gun and remaining calm. The gloves were sent for forensic testing and the DNA found on them matched appellant's. We understand that appellant challenges the introduction of the gloves and testimony concerning the gloves in a separate point; however, we consider all the evidence whether it was admitted correctly or erroneously in deciding whether there was substantial evidence to support the conviction.[17] Substantial evidence supports this conviction. We affirm.
Next, appellant contends that the trial court erred by allowing the gloves and testimony of the gloves into evidence. Evidentiary matters regarding admissibility of evidence are within the sound discretion of the trial court.[18] The appellate court will not reverse a trial court's decision regarding the admissibility of evidence absent an abuse of discretion.[19] The threshold is high and does not simply require error in the decision, but rather that the trial court acted improvidently, thoughtlessly, or without due consideration.[20]
*325 Here, Ryan testified that he saw the gloves in the locked dumpster of Our Keys and that he did not touch anything but called the police. When the State asked Ryan again what he saw in the dumpster, appellant objected to any further testimony regarding the gloves. A contemporaneous objection is required to preserve an issue for appeal.[21] Because appellant failed to object at the first opportunity, any error alleged by the admission of testimony concerning the gloves is not preserved.
Detective Torkelson testified that the mask and the gloves were found crumpled together in the dumpster. When the State attempted to introduce the gloves into evidence, appellant objected, contending that the State had failed to lay a foundation tying the gloves to the robbery. The court overruled the objection. Appellant contends that it was error for the court to admit the gloves into evidence over appellant's foundation objection. Any evidence that is relevant to explain the act, show a motive, or illustrate the accused's state of mind, may be independently relevant and admissible.[22] It is sufficient if the fact may become relevant in connection with other facts, or if it forms a link in the chain of evidence necessary to support a party's contention.[23] Finally, relevant evidence is any evidence which aids in establishing the guilt or innocence of the accused, even though only a slight inference can be drawn from the evidence.[24] After the gloves were admitted, Det. Torkelson testified that Inglis identified the ski mask found with the gloves as the one worn by the suspect. Dixon later testified that the DNA found in the gloves matched appellant's DNA. Thus, the gloves were relevant to show that appellant was the person that robbed Pizza Hut in November 2013. The trial court did not err by allowing the gloves into evidence. However, even if the gloves were admitted in error, it was harmless error.[25] Inglis positively identified appellant as the suspect, Ryan and Det. Torkelson testified that the gloves were located in the dumpster with the mask, Inglis subsequently identified the mask as the one the worn by the robber, and Dixon testified the appellant's DNA was located inside the gloves.
Appellant also argues that the trial court erred by allowing the two notes into evidence. More specifically, appellant contends that the State failed to lay a proper foundation for the notes, that the notes were not relevant, that the probative value of the notes outweighed the risk of unfair prejudice to appellant, and that the notes constituted inadmissible hearsay. Grant testified that appellant asked him and his wife to keep appellant's daughter and take care of her. Grant stated that he had in his possession a computer bag that belonged to appellant. He said that he found two notes dealing with bank robberies inside the bag and immediately turned them over to the police. Appellant objected to the introduction of the notes. The State argued, and the court agreed, that the foundation was laid when Grant testified to finding the notes inside a computer bag that belonged to appellant and that they were not impermissible hearsay because they were not offered for the proof of the matter asserted. The court also agreed *326 with the State that the notes were relevant because they dealt with how to commit a robbery. Appellant further argued that the probative value of the notes was outweighed by the unfair prejudice, because the notes dealt with research about bank robberies, and there was no evidence that appellant committed any bank robberies. Appellant now contends that the probative effect was outweighed by the prejudicial effect because the notes showed the jury that appellant had future plans to rob a bank. This argument is not the same as the one presented to the trial court, and it is not preserved for our review.[26] We hold that the State laid a proper foundation for the introduction of the letters and that the letters were relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake.[27] The court properly admitted the evidence and we affirm this point. However, even if the evidence had been erroneously admitted, we would still affirm, because any error would have been harmless under the facts of this case.
Affirmed.
Abramson, Gladwin, Harrison, Klappenbach, and Vaught, JJ., agree.

This is the third time this case has been before us. We previously ordered rebriefing due to deficiencies in appellant's abstract, addendum, and brief. Lacefield v. State , 2017 Ark. App. 474, 530 S.W.3d 370 ; Lacefield v. State , 2018 Ark. App. 45, 2018 WL 523156.

The truck was described as a dark-colored extended-cab Chevrolet Silverado with a silver tool box, which appeared to be set back away from the rear window with a white object in front of it. An unknown object also appeared to be sticking up in the air on the passenger's side hood area in front of the windshield, and there appeared to possibly be some sort of damage on the passenger's side of the vehicle.

Officer Fry stated the damage was to the driver's side, but this appears to be a mistake.

He was also charged with the robbery of Career Academy of Hair Design in Springdale on May 14, 2014; however, that charged was dismissed.

The handwritten note stated, "[D]unk bag of cash into bucket of water outside bank to foil exploding dyes and electronic trackers." The typed note explained two methods of bank robbery.

Jones v. State , 349 Ark. 331, 78 S.W.3d 104 (2002).

Edmond v. State , 351 Ark. 495, 95 S.W.3d 789 (2003).

Id.

Id.

Ark. Code Ann. § 5-12-102 (Repl. 2013).

Ark. Code Ann. § 5-12-101(2).

Stipes v. State , 315 Ark. 719, 870 S.W.2d 388 (1994).

Appellant was born in January 1964.

Kinsey v. State , 2016 Ark. 393, 503 S.W.3d 772.

Id.

Ark. Code Ann. § 5-12-103(a).

See Boyd v. State , 2016 Ark. App. 407, 500 S.W.3d 772.

Williams v. State , 374 Ark. 282, 287 S.W.3d 559 (2008).

Garcia v. State , 363 Ark. 319, 214 S.W.3d 260 (2005).

Williams, supra.

Pascuzzi v. State , 2016 Ark. App. 213, 489 S.W.3d 709.

Conte v. State , 2015 Ark. 220, 463 S.W.3d 686.

Id.

Id.

An error is harmless when the evidence of guilt is overwhelming, and the error is slight. Cutsinger v. State , 2017 Ark. App. 647, 536 S.W.3d 134.

See Buford v. State , 368 Ark. 87, 243 S.W.3d 300 (2006).

Conte, supra.