Freddie CAREY *v.* STATE of Arkansas

CR 05-782                                  230 S.W.3d 553

Supreme Court of Arkansas
Opinion delivered March 2, 2006

*James P. Clouette*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellant.

ROBERT L. BROWN, Justice. Appellant Freddie Carey appeals from his conviction for rape and his sentence of life imprisonment.[1] His sole assertion on appeal is that the circuit court erred in denying his motion for directed verdict as there was insufficient evidence to sustain a conviction for rape. Specifically, he argues that the sexual intercourse with the victim was consensual, but even if it was not, he did not have the requisite intent to rape due to mental disease or defect. We affirm the judgment of conviction.

A review of the record reveals that during the summer of 2000, the victim, Rose Melton, was visiting her son at his house in a Little Rock trailer park and cleaning up his yard when she met Carey. He had driven up in his car and was talking to Ms. Melton's step-granddaughter, when Ms. Melton walked over to the car to ensure that her step-granddaughter was all right. When she did, Carey began talking to her and told her that they should get together some time. Ms. Melton explained that she was recently divorced and that she was not really interested. Carey then asked her her name and she told him. Ms. Melton, at the time, was wearing a tee shirt which reflected the name of her employer, Central Flying Service.

Sometime later, Carey called Ms. Melton at work and asked to get together. Ms. Melton again told Carey that she was not interested. He continued to call her at work, and, eventually, she gave him her home telephone number because she did not think it was a "good thing" for him to continue to call her at work, and she could reiterate that she was not interested. Carey called Ms. Melton two or three times at home, and similar conversations took place.

On July 5, 2000, Ms. Melton was at her home drinking beer after she had finished cleaning her own yard. At around 8:30 p.m., Carey called and inquired about getting together. Ms. Melton initially told him no, but eventually invited him over, because she

---

[1] While the record reflects that the appellant's last name is "Carey," the judgment and commitment order entered in the case reflects the spelling as "Caery." His notice of appeal reflects the former spelling. Accordingly, we use the spelling "Carey" throughout this opinion.

was lonely and because she thought that she could convince him that she was not interested in dating. After giving him directions to her house, Carey arrived at around 9:00 p.m.

After entering the house, Carey told Ms. Melton that her house was "nice" and that he wanted to look around. She showed him around her home, and when they entered the bedroom, Carey began to kiss Ms. Melton and "pull on [her.]" Ms. Melton told Carey that they were not going to do anything "like [that]" and to stop. She also tried to push him away, telling him that he did not know her and that they were going to sit down and talk. He then pulled her close, trying to kiss her, and pulled her clothes. All the while, Ms. Melton said "no" and told him that they did not know each other.

Carey next "got a little bit rough" with her, according to her description, and continued to pull at her clothes, as he forced her onto the bed. Ms. Melton continued to try to talk him out of it. She begged him not to "do this," and he slapped her in the face five or six times, hurting her mouth and lip, and knocking some teeth loose. At some point, he penetrated her with his penis. After the rape, she told him that she needed to go to the bathroom. He allowed her to go but followed her into the bathroom. When she was finished using the bathroom, he escorted her back to the bedroom holding onto her arm or waist. He next pulled the comforter from her bed and threw it onto the floor. He then raped her again.

At another point, Ms. Melton talked him into stopping and told him she was thirsty. He escorted her into the kitchen where they each had a beer. He then took her back to the bedroom where they had intercourse again. This continued until around 4:00 a.m., when Carey told Ms. Melton that he had to go to work. Carey washed in her bathroom, kissed her goodbye, and left Ms. Melton's home. Ms. Melton drank another beer and went to sleep. Later that morning, she called into work and then called her doctor's office. She went to see her doctor, who did a rape exam.

Ms. Melton reported the rape to the police and initially said that her rapist was a stranger. On July 24, 2000, however, she informed Detective Laura Pritchett of the Little Rock Police Department that she knew her rapist's first name and where he worked. In September 2000, the police showed her a photographic lineup, and she identified Carey.

Carey was charged with rape by forcible compulsion. Following a trial on the charge, he was convicted and sentenced to life imprisonment.

Carey mounts one claim for reversal, which is that the State failed to present substantial evidence to support the conviction. He claims that Ms. Melton's failure to originally tell police officers the truth raises suspicion about her story. He further asserts that there was no valid reason for her delay in reporting the rape or any reason to lie to police officers. He contends that merely because Ms. Melton suffered bruises or lacerations during intercourse does not equate to rape and might simply have been "rough sex." He urges that Ms. Melton consented to the intercourse. In the alternative, he contends that even if there is sufficient evidence to show that he had intercourse with her without her consent, he did not have the culpable mental state required for a conviction. He submits that because he presented evidence that his IQ is 58, as well as evidence of mental disease or defect, and the effect of his failure to take his medication, such evidence should be taken into account when determining whether he intended to commit rape. He concludes that Ms. Melton's actions were too confusing for him to know that she did not consent to the intercourse, and, for that reason, his conviction should be reversed.

In reviewing sufficiency-of-the-evidence claims, this court uses the substantial-evidence test, and we view the evidence in the light most favorable to the State. *See Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005).

While not raised by the State, it appears that Carey's sufficiency argument was not preserved under our rules of criminal procedure. Arkansas Rule of Criminal Procedure 33.1 provides, in pertinent part:

> (a)  In a jury trial, if a motion for directed verdict is to be made, it shall be made at the close of all of the evidence offered by the prosecution and at the close of all of the evidence. A motion for directed verdict shall state the specific grounds therefor.

> . . . .

> (c)  . . . A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense. . . .

Ark. R. Crim. P. 33.1 (2005).

Here, defense counsel for Carey made a generic directed-verdict motion, which the circuit court denied:

> DEFENSE COUNSEL: Well, Judge, I'd move for a directed verdict on the State has failed to —
>
> COURT REPORTER: Mr. Clouette, I need you at the microphone.
>
> DEFENSE COUNSEL: I move for a directed verdict on the sufficiency of the evidence. I don't think the State has met its burden of proof.
>
> CIRCUIT COURT: All right. The motion is denied. We'll be adjourned until 9:30 in the morning.

In renewing the motion, defense counsel referred to lack of forcible compulsion, which the circuit court again denied:

> DEFENSE COUNSEL: I would renew my motion for a directed verdict and I think the testimony, the way it's gone, that the State didn't meet their burden of proof—
>
> PROSECUTOR: I actually can't hear you very well. I apologize.
>
> DEFENSE COUNSEL: — that there was any force until, at best, until after intercourse was already occurring.
>
> CIRCUIT COURT: All right. Your motion will be denied. Let's go over these jury —

This court has held that Rule 33.1 is to be strictly construed. *See Pinell v. State*, 364 Ark. 353, 219 S.W.3d 168 (2005); *Pratt v. State*, 359 Ark. 16, 194 S.W.3d 183 (2004). Accordingly, in order to preserve a challenge to the sufficiency of the evidence, an appellant must make a specific motion for a directed verdict, both at the close of the State's case and at the end of all the evidence, that advises the trial court of the exact element of the crime that the State has failed to prove. *See Grady v. State*, 350 Ark. 160, 85 S.W.3d 531 (2002). *See also Pratt v. State, supra.* The reason underlying the requirement that specific grounds be stated and that the absent proof be pinpointed is that it allows the circuit court the option of either granting the motion, or, if justice requires, of allowing the State to reopen its case and supply the missing proof.

*See Webb v. State,* 327 Ark. 51, 938 S.W.2d 806 (1997). *See also Pratt v. State, supra.* A general motion that merely asserts that the State has failed to prove its case is inadequate to preserve the issue for appeal. *See Beavers v. State,* 345 Ark. 291, 46 S.W.3d 532 (2001). *See also Pratt v. State, supra.*

In the instant case, a review of the motion that was made following the State's case reveals that it did not comply with Rule 33.1. The motion was clearly general and lacked any mention of the specific element or elements of the crime that the State may have failed to establish. Because this motion was general and not specific, Carey failed to preserve his insufficiency claim for appeal. Accordingly, we affirm.

The record in this case has been reviewed for reversible error pursuant to Supreme Court Rule 4-3(h), and none has been found.

Affirmed.