Cite as 2026 Ark. 71

# SUPREME COURT OF ARKANSAS

**No.** CR–25–563

| | | |
|---|---|---|
| JUSTIN THORNTON | | **Opinion Delivered:** Click or tap to enter a date. |
| | APPELLANT | |
| V. | | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-24-182] |
| STATE OF ARKANSAS | | HONORABLE H.G. FOSTER, JUDGE |
| | APPELLEE | |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

The Faulkner County Circuit Court found appellant Justin Thornton guilty of kidnapping, aggravated residential burglary, first-degree domestic battering using a deadly weapon, aggravated assault on a family or household member, first-degree terroristic threatening, and fleeing. His aggregate sentence consists of consecutive sentences of life imprisonment for kidnapping and aggravated residential burglary, plus thirty-one years' imprisonment. For reversal, Thornton argues that the circuit court erred by (1) denying his motion to dismiss all charges; and (2) allowing defense counsel to represent him despite counsel not being certified by the Arkansas Public Defender Commission for Class Y felonies. We affirm.

On April 17, 2024, Thornton was charged by felony information with having committed the following six felony offenses against his wife, Tamikka Thornton, on February 17, 2024: (1) kidnapping (Class Y); (2) aggravated residential burglary (Class Y); (3) first-degree domestic battering, use of a deadly weapon (Class B); (4) aggravated assault

on a family or household member (Class D); (5) first-degree terroristic threatening (Class D); and (6) theft of property – firearm value less than $2,500 (Class D).[1] He was also charged with fleeing on foot from a law enforcement officer, a Class C misdemeanor. The State alleged that under Arkansas Code Annotated section 5-4-501 (Supp. 2025), Thornton is a habitual offender with four or more prior felony convictions.[2] On January 7, 2025, Thornton waived his right to a trial by jury.

The case proceeded to a bench trial on February 11, 2025, when the following evidence was presented. Robert Yates, Tamikka's friend and former boyfriend, requested that police conduct a welfare check on the morning of February 17, 2024, after Tamikka failed to meet him as planned. Officer Charles Case testified that he went to Tamikka's residence on Lucille Street in Conway. As shown in the body-camera video of the welfare check, Case knocked on the front door, side window, and back door while a neighbor tried to call Tamikka's phone. After nearly five minutes, Tamikka answered the front door, although the screened door remained shut. She had something over her mouth, which officers believed at the time to be a CPAP mask; she stated that she would be out in a second. She came outside with luggage a few minutes later, and another officer who had come to assist gave her a ride to meet Yates.

Yates testified that he had known Tamikka for over ten years, and they usually spoke on the telephone once or twice a month. He lived in a suburb of Houston, Texas. Yates

---

[1]The State nolle prossed the theft-of-property charge immediately before trial.

[2]Although the State charged Thornton as a habitual offender and introduced evidence of his prior convictions at trial, the sentencing order does not reflect that Thornton was sentenced under the habitual-offender statute.

stated that he received a phone call from Tamikka at around 3:00 a.m. on February 16.[3] Tamikka was crying and distraught; he told her that he would be there the morning of the 17th to take her to her mother's home in Louisiana. She did not show up to their meeting place as planned. After he called to request a welfare check, Yates parked down the street from Tamikka's residence. Yates saw a black male who was approximately 6 feet to 6 feet 2 inches tall run from behind the residence to the west when the police knocked on the front door. He further testified that when he and Tamikka were close to the Louisiana border she showed him burns on her abdomen, which were covered with gauze pads and duct tape. He bought supplies to treat her third-degree burns, and when they returned to Arkansas the next day, he took Tamikka to Conway Regional Medical Center.

At trial, Tamikka acknowledged that she had been untruthful in her testimony at Thornton's parole-revocation hearing when she testified that the incident had been "BDSM gone wrong." She stated that she did so out of concern for Thornton's family. Leading up to the events of February 17, she and Thornton had been arguing and were contemplating divorce. Thornton was not on the lease at her apartment on Lucille Street, but he sometimes stayed there. Tamikka made the decision to go to her mother's residence in Louisiana, and Yates agreed to drive her there. She testified that she planned to contact the apartment manager to have Thornton removed from the property while she was gone.

---

[3]The timing of Tamikka's call to Yates is not entirely clear from the record. Yates testified initially that he received her call at 3:00 a.m. on the 16th. He later testified that he told her he would "be there in the morning," which Thornton apparently interprets to mean the same morning that he received the call. In any event, Yates testified that it is a seven-and-a-half to eight-hour drive without stops, and there is no dispute that Yates was in Conway to pick Tamikka up the morning of February 17, 2024.

3

Tamikka testified that on the morning of February 17, when she tried to leave to meet Yates, Thornton grabbed her as she was going out the front door and ripped the sleeve of her sweater as he pulled her back inside. They began "tussling" for her phone, which he took from her. Thornton pulled out a gun and said, "[S]it your ho ass down." He then grabbed her by the neck and began choking her. Tamikka testified that she could not breathe and was terrified. Thornton then had her lie down on an ottoman and put her hands behind her back. He zip-tied her wrists and ankles together, covered her mouth with duct tape, and told her, "I can't treat you like my wife anymore. I gotta treat you like my enemy." Thornton placed her in a dark closet and said he would be back to talk. Thornton came back to ask Tamikka for the passcode to her phone. When she would not give it to him, he said, "Well, I got ways of making you talk." Thornton returned from the kitchen after heating up the blade of a butcher's knife. When she again refused to give him her passcode, he burned her stomach with the knife blade. Tamikka stated that Thornton returned to the kitchen and came back with the knife appearing to be "red hot." Tamikka testified that he pressed the red-hot blade to her stomach and held it there—she could smell her flesh burning. She then gave him the passcode so he would stop "torturing" her. Thornton treated her burns using a first-aid kit and again left her in the closet.

Tamikka testified that she heard knocking at the door for about five minutes before she realized Thornton was gone. She maneuvered the zip ties so that she could answer the door; she then found some scissors to remove the zip ties. Tamikka testified that she then gathered her packed bags and left with the officer. She testified that she was initially in shock

4

and more worried about Thornton and his family than she was about herself. After several hours in the car, she eventually told Yates what had happened.

A Snapchat message Thornton sent under the name "For Ever" during the car ride to Louisiana was introduced into evidence. In it, Thornton acknowledges her accusation as follows:

> For one, I'm not at your house. For two, there's no text from me at all to incriminate and to being involved with your issues. So tell the dumb white guy that's counseling you on what to say that my brain is much younger than his. For -- for three, I have no clue as to what in the earth you have been constantly talking about me burning you. What's wrong with you? And how exactly were you burned? And if someone did actually burn you, why would the so-called victim flee the state where they would supposedly be -- supposedly burned without doing a police report and go to another state to stay overnight, chill, party, or whatever, to come back to the original state later to file the police report about something that supposedly happened to them the previous day that wasn't important enough for them to report then, but instead went and chilled in another state.

The State also introduced photographs of Tamikka's wounds—burns on her abdomen, bruising on her neck, and marks on her wrists and ankles—that had been taken at Conway Regional Medical Center, as well as photographs of the tape and zip ties located in the trash can of her apartment, the roll of duct tape, the knife with the burned tip, and the ripped sweater. Tamikka testified that she had scars on her abdomen from the third-degree burns.

Regarding the physical evidence recovered from Tamikka's home, no DNA, blood, or fingerprints were found on the knife, the burn ointment, a piece of tape, or the zip ties. The roll of duct tape and the ripped sweater tested negative for the presence of blood and DNA. However, Thornton's fingerprints were located on the inner cardboard tube of the roll of duct tape.

Following the investigation that was initiated when Tamikka sought medical care, Officer Autumn Smith of the Conway Police Department was asked to "sit on" Tamikka's apartment on the evening of February 18 in an effort to locate Thornton. Officer Smith testified that she was warned not to make contact with him while he was inside the home because he might have a gun. She saw Thornton leave Tamikka's apartment and approached him, twice yelling for him to get on the ground. He ran, and she pursued but was unable to catch him. Officer Smith identified the man coming out of the apartment as Thornton. Thornton was arrested in White Hall several days later and was interviewed by Det. Hannah Slajer of the Conway Police Department. Detective Slajer testified about the four-and-a-half-hour interview, during which Thornton denied the allegations.

For the defense, Thornton testified and denied any wrongdoing. After closing arguments, the circuit court recessed to consider the evidence. The court found Thornton guilty of all charges, and thoughtfully reasoned in part as follows:

> In terms of making my decision, I relied heavily on my determination of the credibility of the witnesses. My determination of the credibility of the witnesses, which was based on my opportunity to view them and to listen to their testimony, to watch their demeanor, to listen to the tone of their voices and all the things that you can experience if you're in a room with somebody while they're telling you something. Also, I looked at some of the factors that the jury instructions tell the jurors they're supposed to look at in determining credibility. Supposed to look at the reasonableness or unreasonableness of their testimony. You're supposed to look at the interest a party might have in the outcome of a case and any other fact or circumstance that would tend to bear on their credibility. I found that the complaining witness in this matter did in fact lie to the parole board, presumably under oath, and that she, once again, lied to the police when she started giving them a statement. However, she started telling what I believe to be the truth based on my perception of her credibility and she explained why she had lied, and it was reasonable to me and credible to me. And I'm gonna note that one of the ways you

6

know somebody's telling the truth is if they tell you something that makes them look bad or hurts them. She got up here in front of everybody today and talked about how she lied. That could subject her to ridicule and criticism and lots of other things, and that bears on a witness's credibility. With regard to Mr. Thornton, in terms of who has an interest in the outcome of the case, looking at these charges and the life sentences that are possible and the years, I can't imagine anybody who wasn't facing the death penalty having more of an interest in the outcome of the case. That bore on my determination of Mr. Thornton's credibility. Also, the consistency of Mr. Thornton's testimony was poor. It wasn't consistent. What he said under oath up here today, tonight, was not consistent. And what he said to the police in his interview was not consistent. So I found his credibility to be poor.

The State introduced certified copies of sentencing orders reflecting Thornton's prior convictions for failure to appear, possession of a firearm by certain persons, abuse of a corpse, and two counts of robbery.[4] The circuit court sentenced Thornton as set out above, and this appeal followed.

For his first point on appeal, Thornton argues that the circuit court erred in denying his motions to dismiss all charges. Specifically, he contends that Tamikka's and Yates's testimony should be disregarded as inherently improbable, physically impossible, and clearly unbelievable. To support his argument, Thornton contends that the timing of Yates's drive from Houston was impossible, that Tamikka could not have answered the door while bound by zip ties and duct tape and then free herself, and that it is unbelievable that she would not have informed the officers of her ordeal or expressed pain when the welfare check was conducted. He also takes issue with other parts of Tamikka's and Yates's testimony, such as

---

[4]The State explained that one of the sentencing orders was not accurate because Thornton's murder conviction had been reversed and dismissed on appeal. *See Thornton v. State*, 2014 Ark. 157, 433 S.W.3d 216 (capital murder); *Thornton v. State*, 2015 Ark. 438, 475 S.W.3d 544 (reversing and dismissing subsequent conviction for first–degree murder in the same case for lack of jurisdiction in the circuit court).

the fact that Yates, who is a trained EMT, would have dressed Tamikka's burn wounds himself and not taken her directly to a hospital. Finally, Thornton asserts that a lack of physical evidence of the offenses against Tamikka and the improbability that Officer Smith had identified him as the fleeing person make the evidence insufficient to support his convictions.

In response, the State argues that Thornton's challenges to the sufficiency of the evidence are not preserved for this court's review. We agree. Arkansas Rule of Criminal Procedure 33.1 requires that a challenge to the sufficiency of the evidence be made by a motion for a directed verdict or, in a nonjury trial, by a motion for dismissal, at the close of the State's case-in-chief and at the close of the defense's case-in-chief. *See* Ark. R. Crim. P. 33.1(b); *Taffner v. State*, 2018 Ark. 99, at 6, 541 S.W.3d 430, 434. Rule 33.1 requires that the motion "state the specific grounds therefor." The rule further provides:

> (c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsections (a) and (b) above will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or judgment. A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense. . . .

Ark. R. Crim. P. 33.1(c). Accordingly, in order to preserve a challenge to the sufficiency of the evidence, an appellant must make a specific motion for either a directed verdict or dismissal, both at the close of the State's case and at the end of all the evidence, that advises the circuit court of the exact element of the crime that the State failed to prove. *See Carey v. State*, 365 Ark. 379, 383, 230 S.W.3d 553, 557 (2006); *Hayes v. State*, 2020 Ark. 297, at

8

10. The requirement that specific grounds be stated and that the absent proof be pinpointed is to allow the circuit court the option of either granting the motion or, if justice requires, allowing the State to reopen its case and supply the missing proof. *See Carey*, *supra*. A general motion merely asserting that the State has failed to prove its case is inadequate to preserve the issue for appeal. *Id*.

The following is Thornton's motion in its entirety:

At this time we'd make a motion for directed verdict. Specifically, that the State has *failed to make a prima facie case* that the defendant did unlawfully or feloniously on or about February 17th, 2024, without consent, restrained another person so as to interfere substantially with her liberty, with the purpose of inflicting physical injury upon her or terrorizing the other person or another person;

that said defendant did unlawfully and feloniously on or about February 17th, 2024, enter or remain unlawfully in the occupiable residence of another person with the purpose of committing an offense punishable by imprisonment and was armed with a deadly weapon or represented by word or conduct that he was armed with a deadly weapon; and enter or remain unlawfully in the occupiable residence of another person with the purpose of committing an offense punishable by imprisonment and inflicted or attempted to inflict death or serious physical injury upon another person;

that the defendant did unlawfully and feloniously on or about February 17th, 2024, commit domestic battering in the first degree with the purpose of causing serious physical injury to a family or household member. The person causes serious physical injury to a family or household member by means of a deadly weapon.

Additionally, that -- that said defendant did unlawfully and feloniously on or about February 17th of 2024 under circumstances manifesting extreme indifference to the value of human life, purposely engaged in conduct that created a substantial danger of death or serious physical injury to a family or household member or under circumstances manifesting extreme indifference to the value of human life purposely impeded or prevented the respiration of another person or the circulation of another person's blood by applying pressure on the throat or neck or by blocking the nose or mouth of the other person;

that said defendant did unlawfully and feloniously on or about February 17th of 2024 with the purpose of terrorizing another person threatened to cause death or serious physical injury or substantial property damage to another person thereby committing the offense of terroristic threatening in the first;

and finally, that said defendant did unlawfully and feloniously on or about February 17th of 2024 flee on foot knowing that his immediate arrest or detention was being attempted by a duly authorized law enforcement officer thereby committing the offense of fleeing on foot.

(Emphasis added.) Thornton renewed his motion at the close of all evidence, and the circuit court again denied it.

It is clear that Thornton's motion was general in nature and lacked the specificity required to preserve his sufficiency challenge for appeal. The motion included none of the specific arguments Thornton now makes on appeal regarding Tamikka's and Yates's testimony being inherently improbable, physically impossible, and clearly unbelievable; he merely stated that the State failed to make a prima facie case and recited the elements of the offenses. There was no reference to the evidence presented in this case, and the motion was no different in substance than one merely reciting that the State failed to make a prima facie case or meet its burden of proving that Thornton committed the charged offenses. We have long held that such general motions are insufficient under Rule 33.1. *E.g.*, *Spencer v. State*, 348 Ark. 230, 234, 72 S.W.3d 461, 463 (2002) (motion for directed verdict stating that the evidence was insufficient, but not specifying in what respect it was deficient, was not specific enough to preserve the sufficiency issue); *Foster v. State*, 2009 Ark. 454, at 5 (motion stating that the defendant did not "actively" cause the victim's death was insufficient to preserve a sufficiency challenge to the requisite intent of purpose for the charge of first-degree murder);

10

*Perry v. State*, 2014 Ark. 535, at 4, 453 S.W.3d 650, 653 (motion stating that "the government hasn't presented enough evidence to take the case to the jury" and "it's insufficient" did not preserve for review the appellant's argument that the testimony of four prosecution witnesses was "so clearly unbelievable" that their testimony should be disregarded as a matter of law).Accordingly, Thornton's arguments are not preserved for our review, and we affirm without reaching the merits of those arguments. *See, e.g., Smith v. State*, 2025 Ark. 26, at 9, 708 S.W.3d 336, 344 (holding that arguments not made in directed-verdict motions below are not preserved for appeal).[5]

For his second point on appeal, Thornton argues that the circuit court erred in allowing defense counsel, Chris Murray, to represent him even though he was not certified by the Arkansas Public Defender Commission to serve as counsel for Class Y felonies. Thornton's argument is based on a motion for continuance that was filed July 18, 2024, in

---

[5]In response to the opinion concurring in part and dissenting in part, we simply note that the length of a motion for dismissal is not the relevant inquiry under Rule 33.1 and our precedent. As to the merits, the credibility of witnesses and the weight to be given their testimony is for the trier of fact, not this court. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Halliburton v. State*, 2020 Ark. 101, at 7, 594 S.W.3d 856, 862. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* The separate opinion is riddled with credibility determinations and attempts to reweigh the evidence. Suffice it to say, the circuit court weighed the evidence as it saw fit, and none of the points raised in the separate opinion are relevant to the sufficiency of the evidence on any of the charged offenses—they merely go to Tamikka's and Yates's credibility or lack thereof, which are not matters for this court to resolve. Finally, we note that the separate opinion fails to cite a single case in which this court has disregarded the fact-finder's credibility determinations and findings as "so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it." *E.g., Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686 (holding that the evidence, viewed in the light most favorable to the State, was sufficient to support the convictions and rejecting the appellant's arguments that certain testimony was clearly unbelievable and inherently unreliable).

which Murray stated: "Counsel for the Defendant has concluded that he has not yet received his Class Y certification. This matter should be continued and reset, until such time that the Defendant's Counsel is Class Y certified." An additional basis for the continuance motion was counsel's need for additional time to review recently obtained discovery. The continuance was granted, and the trial took place in February 2025. No additional motion or objection regarding defense counsel's qualifications was raised before the circuit court. Thornton now argues that forcing him to proceed with Murray as his counsel "essentially deprived [him] of his right to counsel." He argues that the circuit court should have intervened on its own motion under *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

In *Wicks*, we recognized four narrow exceptions to the contemporaneous-objection rule: (1) the circuit court, in a death-penalty case, fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself; (2) the circuit court errs at a time when defense counsel has no knowledge of the error and thus no opportunity to object; (3) the circuit court should intervene on its own motion to correct a serious error; and (4) the admission or exclusion of evidence affects a defendant's substantial rights. *Smith*, 2025 Ark. 26, 708 S.W.3d 336. The third exception is limited to only those errors affecting the very structure of the criminal trial, such as the fundamental right to a trial by jury, the presumption of innocence, and the State's burden of proof. *Id.* We have also stated that this exception is a mere possibility, for it has not yet occurred in any case. *Id.* In the case at bar, the record does not reveal whether counsel obtained the Class Y certification. In any event, the mere possibility that counsel did not obtain a certification from the public defender commission does not constitute a structural error within the third *Wicks* exception. To the

12

extent that Thornton may be attempting to assert an ineffective-assistance-of-counsel claim, this court has previously rejected the argument that such a claim may be asserted on direct appeal in the absence of an objection below. *Holland v. State*, 2015 Ark. 318, at 3 n.2, 468 S.W.3d 782, 785 n.2 (citing *Rackley v. State*, 371 Ark. 438, 441, 267 S.W.3d 578, 581 (2007)). We decline to reach Thornton's argument on this point because it is not preserved for this court's review.

Affirmed.

WEBB, J., concurs.

WOMACK and BRONNI, JJ., concur in part and dissent in part.

**BARBARA W. WEBB, Justice, concurring.** Like Justice Womack, I disagree with the majority that Justin Thornton's sufficiency claim is unpreserved. However, there is substantial evidence to support the verdict, and I join the majority's disposition of this case.

Regarding the contents of a motion to dismiss made in a criminal bench trial, Rule 33.1(b) of the Arkansas Rules of Criminal Procedure states:

> (b) In a nonjury trial, if a motion for dismissal is to be made, it shall be made at the close of all of the evidence. The motion for dismissal shall state the specific grounds therefor. If the defendant moved for dismissal at the conclusion of the prosecution's evidence, then the motion must be renewed at the close of all of the evidence.

(Emphasis supplied.) The essence of Thornton's motion to dismiss was that, despite the victim's testimony, the State failed to prove he was the perpetrator. That issue was clearly preserved.

Beyond question, the trier of fact was apprised of the issue. Unlike the record we confront when we review a jury trial, the record here reflects that the circuit court made

13

extensive findings regarding its reasoning when it rendered the verdict:

> In terms of making my decision, I relied heavily on my determination of the credibility of the witnesses. My determination of the credibility of the witnesses, which was based on my opportunity to view them and to listen to their testimony, to watch their demeanor, to listen to the tone of their voices and all the things that you can experience if you're in a room with somebody while they're telling you something. Also, I looked at some of the factors that the jury instructions tell the jurors they're supposed to look at in determining credibility. Supposed to look at the reasonableness or unreasonableness of their testimony. You're supposed to look at the interest a party might have in the outcome of a case and any other fact or circumstance that would tend to bear on their credibility. I found that the complaining witness in this matter did in fact lie to the parole board, presumably under oath, and that she, once again, lied to the police when she started giving them a statement. However, she started telling what I believe to be the truth based on my perception of her credibility and she explained why she had lied, and it was reasonable to me and credible to me. And I'm gonna note that one of the ways you know somebody's telling the truth is if they tell you something that makes them look bad or hurts them. She got up here in front of everybody today and talked about how she lied. That could subject her to ridicule and criticism and lots of other things, and that bears on a witness's credibility. With regard to Mr. Thornton, in terms of who has an interest in the outcome of the case, looking at these charges and the life sentences that are possible and the years, I can't imagine anybody who wasn't facing the death penalty having more of an interest in the outcome of the case. That bore on my determination of Mr. Thornton's credibility. Also, the consistency of Mr. Thornton's testimony was poor. It wasn't consistent. What he said under oath up here today, tonight, was not consistent. And what he said to the police in his interview was not consistent. So I found his credibility to be poor.

In short, in a case where the victim presented evidence regarding the identity of the perpetrator and where the alleged perpetrator specifically denied being responsible, the finder of fact found the victim credible and Thornton not credible.

I am mindful that the court has also held that it will disregard testimony that the finder of fact deemed credible as long as the testimony was "so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it." *Conte v. State*, 2015 Ark. 220, at 16, 463 S.W.3d 686, 696 (citing *Williams v. State*, 351

14

Ark. 215, 91 S.W.3d 54 (2002)). Seeming confusion over details concerning the timeline of testimony given more than a year after the event does not make all of her testimony so "inherently improbable, physically impossible, or so clearly unbelievable" as to justify this court's invasion of the fact-finder's province to determine witness credibility. Likewise, slipping out of zip ties is not a physically impossible feat. Conversely, severe burns on the victim's abdomen corroborated her story.

For the foregoing reasons, I would reach the merits and affirm the verdict.

I concur.


**SHAWN A. WOMACK, Justice, concurring in part and dissenting in part.**
First, I disagree with the majority that Justin Thornton's sufficiency claim is unpreserved. As the majority opinion shows, Justin's counsel presented a lengthy oral motion to dismiss, addressing each element of the charges he was facing.[1] I struggle to see what more Justin could have reasonably done to meet the burden for preservation that the majority has set. Must he address every piece of evidence as it relates to each element? That would not be reasonable. Here, the motion to dismiss sufficiently apprised both the circuit court and the State of the deficient evidence: the State failed to introduce enough evidence for at least one element of each charge.[2] Because of this, I would hold that Justin's sufficiency challenges are preserved. I do, however, agree with the majority that his argument about

---

[1]*Law v. State*, 375 Ark. 505, 508, 292 S.W.3d 277, 280 (2009) ("A motion to dismiss in a bench trial is identical to a motion for a directed verdict in a jury trial in that it is a challenge to the sufficiency of the evidence.").

[2]*See* Ark. R. Crim. P 33.1(c).

his trial counsel's Class Y certification is unpreserved and that none of the *Wicks* exceptions apply.[3]

Second, because Justin's sufficiency challenge is preserved, I would reverse and dismiss his convictions for kidnapping, aggravated residential burglary, first-degree domestic battery, aggravated assault on a household or family member, and terroristic threatening. When considering whether substantial evidence supports the verdict, this court considers the evidence presented in the light most favorable to the State.[4] This court will not disregard the fact-finder's credibility judgments and findings unless they are "so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it."[5] Here, Tamikka Thornton's testimony is so incredible that it cannot serve as a basis for substantial evidence to support Justin's convictions for kidnapping, aggravated residential burglary, first-degree domestic battery, aggravated assault on a household or family member, and terroristic threatening.

Around 3:00 a.m. on February 17, 2024, Tamikka called her former boyfriend, Robert Yates. Complaining of marital issues with her husband, Justin, Tamikka asked Yates to drive from Allen, Texas, pick her up in Conway, and drive her to her mother's house in Louisiana. Yates left immediately and arrived at the Conway Big Lots between 7:00 and 7:15 that morning. When he could not get in touch with Tamikka, he asked the Conway

---

[3]*Holland v. Arkansas*, 2015 Ark. 318, at 3, n.2, 468 S.W.3d 782, 785 n.2.

[4]*Matthews v. State*, 2025 Ark. 213, at 4, 725 S.W.3d 16, 19 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[5]*Conte v. State*, 2015 Ark. 220, at 16, 463 S.W.3d 686, 696.

Police Department to do a welfare check.[6]  After a police officer knocked on Tamikka's doors and window for several minutes, she finally answered. Tamikka came to the door with something strapped across her face, which the responding officer described as a CPAP mask; but Tamikka testified it was duct tape (which it appears to be). She told the officers that she would "be out in a second" and closed the door.  A little more than three minutes later, Tamikka returned to the door with a rolling suitcase, a cross-body bag, and a few other belongings and told the police that she needed a ride to Oak Street to meet Yates.

Seemingly unbeknownst to the officers, Yates also went to Tamikka's residence to surreptitiously observe the welfare check.  Yates testified that he was parked "probably 100 – 150 feet away[,]" and that "[w]hile the police were knocking on the front door, [he] saw a black male, about 6 foot, 6'2", wearing a hooded sweatshirt and blue jeans run west from behind the residences."  When one of the officers called Yates and told him that he would bring Tamikka to meet him, Yates drove to the McDonald's on Oak Street but did not tell police anything about the "phantom" man running from Tamikka's home.  Once Yates and Tamikka were together, they embarked on a drive to Tamikka's mother's house in Ferriday, Louisiana.  During this interaction, Tamikka never told police that anything had happened to her that morning or that she was ever with Justin.  She also did not immediately tell Yates about the alleged attack, either.  Instead, she waited until they were "out of Little Rock" to tell him and didn't show him the burns until they "got to the state line area."

_____

[6]The responding officer is heard telling one of Tamikka's neighbors that Yates has been trying to get in touch with her since 8:00 that morning, not 7:00 or 7:15. (RT 117); State's Ex. 1 at 1:32. Yates said he waited forty minutes before flagging down a police officer. (RT 139).

Nevertheless, they continued to Tamikka's mother's house in Louisiana without seeking any kind of professional medical treatment.

It was not until the following day, February 18, that Tamikka and Yates decided to return to Conway from Louisiana to go to the hospital for Tamikka's burn wounds. (One might ask: why did she not just go to the hospital in Louisiana or any of the other hospitals they passed on the way there or back?) Tamikka proceeded to claim that she was leaving her apartment the morning of February 17 when Justin "grabbed [her] back in[,]" pointed a gun at her, choked her to the point she could not breathe, tied her wrist and ankles with zip ties behind her back, duct taped her mouth, put her in a closet, and burned her stomach twice with a heated knife in an effort to force her to reveal her phone password. Tamikka then claimed that Justin put ointment on her burn wounds and bandaged the wounds with band-aids and duct tape. Tamikka testified that despite all this, she "was able to maneuver the Zip ties by the shows that [she] would watch on A&E shows, like Surviving Evil or Sleeping With the Enemy" and answer the door when the police arrived to do a welfare check.

Start with Tamikka's claim that she successfully maneuvered out of zip ties that tied her hands behind her back while she was locked in a dark closet with severe wounds to her stomach. This is totally unbelievable. Tamikka's testimony that she did not remove the zip ties until after she met with the officers at the door is also arguably contradicted by the officer's body-worn camera footage, which shows Tamikka opening the door with her hands.

18

It is also troubling that Tamikka did not tell police about any of this when they responded to the scene of the alleged crime. Nor did she tell the officer who drove her to meet with Yates anything about her severe pain from supposed burn wounds on her stomach or the fact that she had just been kidnapped and tortured. Tamikka claims she did not tell the police anything about this at that time because she "was more worried about how [Justin's] family would feel to not have him around." But right after testifying to that, she stated that she "wasn't concerned about how [she] was feeling at that moment, because at this – [she's] still reeling from the shock of everything. It's still fresh to" her. This is completely contradictory. On top of that, Tamikka did not seek professional medical care for the burn wounds that Justin supposedly inflicted on her until after she finished a two-day roundtrip drive from Conway to Louisiana.

But the problems do not stop there. Tamikka previously lied under oath about the incident. The month after the alleged kidnapping and torture, Tamikka testified at Justin's parole-revocation hearing and claimed that her injuries stemmed from an incident of sexual deviancy that went too far. At trial, however, she admitted having made that story up. The circuit court's attempt to reconcile these conflicting stories—that lying this time around "could subject her to ridicule and criticism and lots of other things"—is an attempt to fit a square peg into a round hole.

Additionally, Tamikka has history of self-harm, including attempts to "cut her own wrists before[,]" which required her to be on a twelve-drug cocktail. This has included incidents where "family members [had] to restrain her from hurting herself, and she can't even remember hurting herself." As Justin testified, after one of these episodes, "[w]hen

19

she come[s] back to herself, then she finally realizes she done lost it or black out." For all these reasons, Tamikka's testimony is "so inherently improbable" and "clearly unbelievable" that it cannot be a basis for the court's conclusion. that substantial evidence supports Justin's convictions for kidnapping, aggravated residential burglary, first-degree domestic battery, aggravated assault on a household or family member, and terroristic threatening.[7] Simply put, her claims are so far-fetched that they undermine the entirety of her testimony, and the State, therefore, failed to present substantial evidence to support these convictions. I would reverse and dismiss, accordingly.

Justin's conviction for fleeing, on the other hand, is supported by substantial evidence. Officer Autum Smith was surveilling Justin's apartment the day following the alleged incident when she walked outside. She tried to stop him, yelling for him to get on the ground, but he fled. Officer Smith, however, was able to positively identify Justin as the man who fled from her. This is substantial evidence that Justin knew "that his . . . immediate arrest or detention [wa]s being attempted by a duly authorized law enforcement officer" and that he fled from the officer on foot.[8] Justin's argument that his face cannot be seen on the body-worn camera is not enough to undermine Officer Smith's testimony.

Respectfully, I concur in part and dissent in part.

BRONNI, J., joins.

*James Law Firm*, by: *William O. "Bill" James, Jr.* and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.

---

[7] *Conte*, 2015 Ark. 220, at 16, 463 S.W.3d at 696.

[8] Ark. Code Ann. § 5-54-125(a) (Repl. 2024).